# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CALIFORNIA PROTON TREATMENT CENTER, LLC,[1] | Case No. 17-_____ (___) |
| Debtor. | |

## DECLARATION OF J. JETTE CAMPBELL IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY MOTIONS

I, J. Jette Campbell, being duly sown, deposes and says:

1.      On March 1, 2017, California Proton Treatment Center, LLC, a Delaware limited liability corporation (the "***Debtor***"), commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") with the United States Bankruptcy Court for the District of Delaware (the "***Court***").  I am the Chief Restructuring Officer of the Debtor, and I am authorized to submit this declaration (the "***Declaration***") on behalf of the Debtor.  Beginning in late January 2017 and continuing through the Petition Date, I, along with several professionals of Carl Marks Advisory Group LLC ("***CMAG***"), have devoted substantial amounts of time and effort working with members of the Debtor's management to, among other things, assist in the development of near-term projections, assist in short-term cash management activities, and coordinate the Debtor's efforts to prepare for a chapter 11 filing.  As a result, I have become thoroughly familiar with the day-to-day operations and the business and financial affairs of the Debtor.

2.      The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]    Pursuant to 11 U.S.C. § 342(c)(1), the last four digits of the Debtor's federal tax identification number are: 9073.  The location of the Debtor's place of business and its address for notice purposes is  9730 Summers Ridge Rd, San Diego, CA 92121, Attn: Wilson Williams, Manager.

3.     I submit this Declaration to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of this case and in support of the first day motions and applications filed in this case (the "***First-Day Motions***").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtor's representatives, my review of the relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.     This Declaration is divided into two sections.   Section I provides a brief description of the Debtor's current organizational and capital structure, its operations, and the liquidity events giving rise to this case.  Section II sets forth those facts that are most germane to this Court's determination of the Debtor's various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

**I.     Background and Events Leading to the Commencement of the Chapter 11 Case**

    **A.     Corporate Structure**

5.     The Debtor is a Delaware limited liability company that was formed on June 30, 2009.  The Debtor is currently governed by one manager who is also the sole member of the Board of Managers.

6.     The membership interests in the Debtor (the "***Membership Interests***") are issued in four separate classes: Class A-1, Class A-2, Class B, and Class C.  The Class A-1 Membership Interests are held by CPTC Institutional Investments, LP, a partnership whose general partner is WFG Health Ventures, LLC ("***WFG Health***") and who invested in the Debtor in or around 2010, and by Kelcy L. Warren, who invested in the Debtor in 2012.   The Class A-2 Membership Interests were issued to investors in or around 2010.  The Class B Membership Interests are held

by Advanced Particle Therapy, LLC ("***APT***"), an entity that specializes in the development of proton therapy cancer treatment facilities, and that has provided the Debtor with certain services with respect to the development, financing, construction, and operation of the Proton Center (defined below).  Lastly, the Class C Membership Interests are held by fewer than ten entities that collectively provided $700,000 in bridge financing to the Debtor in October 2009.  The various rights and obligations of each class of Membership interests are set forth in the Amended and Restated Limited Liability Agreement of California Proton Treatment Center, LLC, dated January 15, 2010, as amended by the First Amendment to Limited Liability Company Agreement dated January 11, 2017 (the "***LLC Agreement***").

### B.    Prepetition Capital Structure

7.    The Debtor raised a total of $66.9 million in consideration for the Class A-1 and Class A-2 Membership Interests: $18.8 million from the holders of the Class A-1 Membership Interests and $48.1 million from the holders of the Class A-2 Membership Interests.  The Debtor also raised $700,000 in bridge financing from persons holding the Class C Membership Interests.

8.    The Debtor has also obtained debt financing pursuant to that certain Loan and Security Agreement dated September 30, 2011 (the "***Original Loan Agreement***") between the Debtor as borrower, ORIX Capital Markets, LLC ("***ORIX***")[2] as agent and lender, and Varian Medical Systems International AG ("***Varian Lender***") as the second lender.  The Original Loan Agreement was amended and restated three separate times, most recently on November 6, 2015 (currently, the "***Prepetition Facility***", together with any other agreements, instruments, notes, guaranties and other documents related thereto, collectively, the "***Prepetition Loan***

---

[2]    ORIX is both a lender and the agent for the Prepetition Secured Parties under this facility.

***Documents***").[3]   The lenders under the Prepetition Facility currently are ORIX, Varian Lender, and JPMorgan Chase Bank, N.A.[4] ("***JPM***, and collectively with ORIX and Varian Lender, the "***Prepetition Secured Parties***"), with ORIX serving as the agent on behalf of the Prepetition Secured Parties. All obligations of the Debtor arising under the Prepetition Facility and the Prepetition Loan Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations in the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, are collectively referred to as the "***Prepetition Obligations***" in this Declaration and in the First-Day Motions.

9.       Under the Prepetition Facility, the Prepetition Secured Parties loaned the Debtor $185 million across three separate tranches, the indebtedness of which are now reflected in three separate sets of promissory notes (each as defined in the Prepetition Loan Documents, the "***Tranche A Notes***", "***Tranche B Notes***", and "***Tranche C Notes***").  Originally, the Prepetition Secured Parties provided the Debtor with $165.3 million in debt financing.  They then provided the Debtor with an additional $10 million in debt financing when the parties executed the second amendment to the Prepetition Loan Agreement.  Most recently, they provided the Debtor with an additional $9.7 million in debt financing when the parties executed the third amendment to the Original Loan Agreement.

10.      As security for the Debtor's repayment obligations under the Prepetition Loan Documents, the Debtor granted to the Prepetition Agent, for the benefit of the Prepetition

---

[3]     The prior two amendments occurred on October 25, 2013 and June 10, 2014.

[4]     JPM was not a lender to the original prepetition lending facility.  It became a lender in June 2014 in connection with the second amendment to the lending facility.

Secured Parties, a first priority security interest in and lien on substantially all of the Debtor's assets, including: (a) the Collateral (as defined in the Prepetition Loan Documents); (b) all real property and all improvements thereon (including the Proton Center, defined below); (c) all funds of the Debtor on deposit from time to time with ORIX or any agent of ORIX or on deposit in any depository account controlled by ORIX, including without limitation, all Deposits (as defined in the Prepetition Loan Documents), and (d) all Personal Property, including, without limitation, all of the Debtor's personal property, fixtures, attachments and equipment located upon, attached to, used or required to be used in connection with the operation of the Property, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Electronic Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, and Supporting Obligations (each as defined in the Prepetition Loan Documents), and all replacements, substitutions, and additions to such property and all proceeds thereof (collectively, the "***Prepetition Collateral***").

11.    Pursuant to the Prepetition Loan Documents, the Debtor was, as of the Petition Date, indebted to the Prepetition Secured Parties in an amount: (i) not less than $180,739,882.28, which consists of aggregate principal amount of the Prepetition Obligations (including not less than (x) $161,384,352.73 in outstanding principal of Tranche A Notes, (y) $9,749,646.04 in outstanding principal of Tranche B Notes (as defined in the Prepetition Facility), and (z) $9,605,883.51 in outstanding principal of Tranche C Notes (as defined in the Prepetition Facility)), (ii) certain protective advances made by the Prepetition Secured Parties, (iii) accrued and unpaid interest (including at the default rate), and certain costs, fees and charges (including any attorneys', accountants', appraiser' and financial advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents), and (iv) additional amounts to be

determined now or hereafter due under the Prepetition Loan Documents.

### C.    Overview of Business Operations

12.    The Debtor was formed in June 2009 to develop and operate a licensed, freestanding healthcare center in the San Diego, California area providing proton radiation treatment services to patients with cancerous solid tumors (the "***Proton Center***").  Proton therapy is an advanced form of radiation therapy that uses a beam of protons to attack cancerous cells. This method allows the radiation dose to be concentrated more precisely on the cancerous cells, providing for higher radiation dosage, reduced patient side effects, fewer patient treatments, improved local cancer control, improved quality of life for the cancer patient, shorter treatment times and enhanced patient throughput.

13.    The Proton Center opened in February 2014.  It is an approximately 100,000 square foot purpose-built facility located in San Diego, California that is unique to the region, housing proton therapy equipment, as well as diagnostic, planning and treatment equipment.  It is staffed with full-time physicians and medical support personnel experienced in the use of proton therapy.

### (1)    Financing and Leasing of the Proton Center

14.    The Debtor financed the purchase, development, and operations of the Proton Center with the proceeds of the Prepetition Facility and the equity investments described above. In connection with the extension of debt under the Prepetition Facility, on September 30, 2011, the Debtor entered into three separate agreements concerning the ownership and occupancy of the Proton Center.  First, the Debtor executed that certain Deed of Trust, with Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "***Proton Center Mortgage***") in favor of ORIX, as the agent for the Prepetition Secured Parties.  Second, the Debtor and ORIX Proton San Diego, LLC ("***ORIX SD***"), an affiliate of ORIX, executed a ground lease whereby

the Debtor, as ground lessor, leased the Proton Center to ORIX SD, as ground lessee (the "***Ground Lease***").   Third, ORIX SD and the Debtor entered into a ground sublease, whereby ORIX SD, as ground sublessor, leased the Proton Center back to the Debtor as ground sublessee (the "***Ground Sublease***").

### (2)    The Operation of the Proton Center

15.    On June 10, 2010, the Debtor and Scripps Clinic Medical Group, Inc. ("***Scripps***") entered into an agreement (as amended on October 21, 2013, the "***Services Agreement***") to facilitate the delivery of the medical care at the Proton Center.   Under this Agreement, each of the Debtor and Scripps is obligated to perform certain operational functions for the Proton Center.   The Debtor is generally responsible for maintaining the non-medical aspects of the Proton Center's operations (such as utilities, maintenance, property taxes, property management, etc.), and for supplying and maintaining the proton systems equipment necessary to deliver proton therapy to patients.   Scripps, in turn, is responsible for delivering the actual medical care to the patients.   In such capacity, Scripps is responsible for hiring physicians and other health care personnel (all of whom are employees of Scripps, not the Debtor), maintaining the patients' medical records, and facilitating medical billing and revenue collection. The Debtor and Scripps each receive compensation from revenues generated by the Proton Center's operations, which is distributed between the Debtor and Scripps through a revenue sharing formula set forth in the Services Agreement.

16.    The Services Agreement (originally executed on June 10, 2010) predates the extension of the Prepetition Facility and the related Proton Center Mortgage, Ground Lease, and Ground Sublease (each executed on September 30, 2011).   As a condition for the Prepetition Secured Parties' willingness to enter into the Prepetition Facility, the Debtor, ORIX (on behalf of and for the benefit of the Prepetition Secured Parties), and Scripps entered into that certain

Multi-Party Agreement (the "***Multi-Party Agreement***") on September 30, 2011.  This Agreement purports to define the parties' respective rights and interests in the Proton Center.

**(3)    The Purchase and Management of the Proton Systems**

17.    Under the Services Agreement, the Debtor is obligated to supply and maintain the proton therapy equipment at the Proton Center.  To fulfill this obligation, on April 29, 2010, the Debtor and Varian Medical Systems, Inc. ("***Varian Systems***")[5] entered into that certain Proton System Purchase Agreement (the "***Varian Supply Agreement***"), pursuant to which Varian Systems agreed to supply and install the equipment, hardware, firmware and software (collectively, the "***Proton System***") necessary to provide the proton therapy at the Proton Center. On June 29, 2011, the Debtor and Varian Systems executed a separate Proton System Operations and Maintenance Agreement (the "***Varian O&M Agreement***"), pursuant to which Varian Systems agreed to provide certain maintenance and technical operations with respect to the Proton Systems.

**D.    Events Leading to a Chapter 11 Filing**

18.    Since its opening in February 2014, the Proton Center has not operated on a profitable or even a break-even basis.  As a result, the Debtor has relied on continual funding from the Prepetition Facility to maintain operations at the Proton Center.  The Prepetition Secured Parties have worked with the Debtor to accommodate these financial difficulties by amending the Prepetition Facility on three separate occasions.  Most recently, on November 6, 2015, the Debtor and the Prepetition Secured Parties executed the third amendment to the Prepetition Facility, as well as that certain Secondment Agreement and Consent to Secondment (the "***Secondment Agreement***").  The third amendment to the Prepetition Facility, among other

---

[5]    Varian Systems is an affiliate of Varian Lender

things, extended an additional $9.7 million in credit to the Debtor.  The Secondment Agreement, in turn, forestalled the Prepetition Secured Parties' right to foreclose on the Prepetition Collateral, under certain circumstances, until April 1, 2017.  The Secondment Agreement was terminated prior to the Petition Date.

19.     Despite these efforts, the Proton Center has been unable to adequately improve its operations to achieve profitability.  The Debtor is currently facing an acute shortage of operating capital, and at this point, the Prepetition Secured Parties have informed the Debtor that they are unwilling to extend any further credit outside of bankruptcy.  The Debtor has not been able to attract alternative sources of capital, and based on an assessment of the limited alternatives before it, the Debtor has concluded that the best path forward for the Debtor and its creditors is a bankruptcy proceeding that incorporates a sale of substantially all of the Debtor's assets.

## II.     First-Day Motions[6]

### A.     Motion of the Debtor for Entry of an Order Extending Time for Debtor to File its List of Equity Security Holders, Schedules, and Statement of Financial Affairs ("Extension Motion").

20.     Due to the size of the Debtor's business and the relative complexity of its creditor and vendor relationships, I believe that the Debtor will be unable to complete the list of its equity security holders (the "*Equity Holder List*"), schedules of assets and liabilities (the "*Schedules*") and the statement of financial affairs (the "*SOFA*") by the current deadlines.  Given the substantial burdens already imposed on the Debtor's management by the commencement of this Chapter 11 Case, the limited number of individuals available to collect the information, the competing demands upon such individuals, and the time and attention that the Debtor must devote to the restructuring process, I believe that "cause" exists to extend the deadline to file the

---

[6]     Any capitalized term used but not defined in this section shall have the meaning ascribed to it in the underlying applicable motion.

Equity Holder List, Schedules, and SOFA through and including April 14, 2017. Further, I believe that the requested extension will enhance the accuracy of the Equity Holder List, Schedules, and SOFA and will avoid the necessity of substantial subsequent amendments.

> **B.**     **Motion for Entry of an Interim and a Final Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Payment, and (III) Establishing Procedures for Resolving Requests for Adequate Assurance of Payment (the "Utilities Motion").**

21.     I believe that uninterrupted Utility Services (as defined below) are necessary to preserve the value of the Debtor's estate while the Debtor devotes its efforts to the reorganization process. I further believe that the disruption of Utility Services at the Proton Center would likely be costly to the Debtor as the Debtor would be forced from the outset of this Chapter 11 Case to focus on finding replacement Utility Providers (if available) and Utility Services, rather than focusing on its reorganization efforts. More importantly, the Debtor's day-to-day operations involve the treatment of cancer patients, many of whom are critically ill. I believe that a disruption of Utility Services could mean that these patients may not receive their necessary— and critical—treatments. It is therefore paramount, in my view, that the Debtor continues to have uninterrupted Utility Services.

22.     The Debtor incurs utility expenses in the ordinary course of business for, among other things, water and sewer, electricity, gas, telephone, data services, waste removal and other similar services (collectively, the "***Utility Services***") from various utility companies and other providers (the "***Utility Providers***"). A non-exhaustive list of the Utility Providers providing Utility Services to the Debtor is attached to the Utilities Motion as Exhibit B (the "***Utility List***"). The Debtor has exercised its best efforts to list all of the Utility Providers in Exhibit B, but it is possible that certain Utility Providers may have been omitted from this list.

23.     In the prepetition period, the Debtor paid a monthly average of approximately $123,000 to the Utility Providers for Utility Services.  One Utility Provider, San Diego Gas & Electric ("**SDGE**"), encompasses the vast majority of the Debtor's average monthly billings for Utility Services, incurring a monthly average of $109,000.  SDGE currently holds a deposit from the Debtor in the amount of approximately $250,000 (the "**SDGE Deposit**").  Accordingly, the Debtor believes that SDGE already possesses adequate assurance within the meaning of section 366(c)(1)(A)(i) of the Bankruptcy Code, and will be excepted from the Adequate Assurance Deposit (as defined in the Utilities Motion).  The average monthly cost for Utility Services other than those provided by SDGE is approximately $14,000.

24.     The Debtor seeks the relief requested in the Utilities Motion to preserve the protections that Utility Providers have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services.

25.     The Debtor believes that each of its Utility Providers have been paid all amounts owed prior to the Petition Date, or will be paid all prepetition amounts owed under the Critical Vendors Motion.  In addition, the Debtor fully intends to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating its business.  However, to the extent any Utility Provider may remain unpaid despite the Debtor's prepetition payments, payments pursuant to the Critical Vendors Motion, and the Debtor's commitment to making timely postpetition payments in the ordinary court, the Debtor propos to provide postpetition adequate assurance of payment.  Indeed, the Debtor expects that borrowings under its proposed postpetition financing will be sufficient to pay for its postpetition Utility Services.  In fact, the payment of postpetition Utility Services are a part of, and subject to, the

terms and conditions of the Debtor's proposed postpetition financing and the budgets related thereto.

26.     I believe, and the Debtor submits, that the SDGE Deposit, the Adequate Assurance Deposit (as defined in the Utilities Motion), and the Debtor's ability to make postpetition Utility Services payments in the ordinary course of business pursuant to the terms of its proposed postpetition financing, taken together with the facts and circumstances of the Chapter 11 Case (collectively, the "***Proposed Adequate Assurance***"), constitute sufficient adequate assurance to the Utility Providers within the meaning of section 366 of the Bankruptcy Code. I believe that these protections will ensure that all Utility Providers have adequate assurance of payment throughout this Chapter 11 Case, and  that no other or further assurance is necessary, especially in light of the Debtor's payments of outstanding amounts owed prepetition or pursuant to the Critical Vendor Motion.

27.     I believe that the Proposed Adequate Assurance gives the Utility Providers ample assurance of payment in a well-established manner. I further believe that the circumstances surrounding the Debtor, including the availability of cash pursuant to its proposed postpetition financing, indicate that the Debtor will meet its postpetition obligations to the Utility Providers as those come due.

28.     The Debtor proposes to protect the Utility Providers further by establishing the Adequate Assurance Procedures provided in the Utilities Motion, under which any Utility Provider may request additional adequate assurance in the event that it can demonstrate facts and circumstances that merit additional protection.

29.     By establishing the Adequate Assurance Procedures, the Debtor seeks to implement an orderly process to determine the amount of assurance of payment that is adequate.

I believe, and the Debtor submits, that the mechanisms proposed in the Utilities Motion strike a reasonable, common-sense balance between providing "adequate assurance of payment for utility service that is satisfactory" as set forth in section 366(c)(2) of the Bankruptcy Code, on the one hand, and the Debtor's well-recognized need to conserve cash for use in its business on the other. Without the Adequate Assurance Procedures, the Debtor could be forced to address numerous requests by Utility Providers in an unorganized manner during the critical first stages of its reorganization efforts.

30.     I also believe that the Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. I think this will protect the Debtor from an attempt by a Utility Provider to delay a request until the last minute in an effort to force the Debtor to agree to its request or face cessation of essential services.

**C.      Motion for Entry of an Order Authorizing the Debtor, *Nunc Pro Tunc* to the Petition Date, to (I) Retain Carl Marks Advisory Group LLC to Provide the Debtor a Chief Restructuring Officer and Certain Additional Personnel, and (II) Appoint J. Jette Campbell as Chief Restructuring Officer (the "<u>CM Motion</u>").**

31.     The Debtor chose CMAG and me as a restructuring advisor and CRO (as defined in the CM Motion), respectively, because of CMAG's extensive experience providing restructuring services in reorganization proceedings and its excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. Moreover, the Debtor chose CMAG and me because of the in-depth knowledge and familiarity that CMAG had garnered regarding the Debtor and its business operations in the period leading up to the Petition Date in the role of restructuring consultants, and the belief that by continuing the existing relationship with CMAG, rather than retaining a new advisory firm, the Debtor could minimize disruptions to its restructuring efforts that might otherwise arise from the appointment of a new CRO.

32.     Accordingly, effective on January 30, 2017, the Debtor and CMAG entered into the Engagement Agreement (as defined in the CM Motion and attached thereto as <u>Exhibit B.1</u>) under which the parties have agreed that I will serve as the Debtor's CRO.  Further, CMAG has agreed to provide other CMAG employees ("***Additional Personnel,***" and collectively with me "***CMAG Professionals***") as necessary to support the CRO and the Debtor's existing management team in their restructuring efforts during this Chapter 11 Case.

33.     In consideration of the size and complexity of its business, as well as the exigencies of the circumstances, the Debtor has determined that the services of experienced restructuring managers will substantially enhance its efforts to maximize the value of its estate. The CMAG Professionals are well-qualified to act on the Debtor's behalf given their extensive knowledge and expertise with respect to chapter 11 proceedings.

34.     Given the numerous issues which the CMAG Professionals may be required to address in the performance of their services, CMAG's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in chapter 11, the Debtor submits that the fee arrangements set forth in the Engagement Agreement are reasonable and reflect a proper exercise of the Debtor's business judgment.

35.     The CMAG Professionals have already proven to be of invaluable assistance in the Debtor's efforts in the development of near-term projections, assisting in short-term cash management activities and coordinating the Debtor's efforts to prepare for a possible chapter 11 filing.  The Debtor believes that CMAG Professionals will be able to continue providing services that benefit the Debtor's estate and creditors.  Moreover, the preexisting relationship that CMAG and I have with the Debtor ensures that the appointment of a CRO at this juncture will not

disrupt the administration of the Chapter 11 Case.

36.    I believe that the Debtor has been able to secure the services of CMAG Professionals during this Chapter 11 Case on economic terms that are fair and reasonable and beneficial to the estate.    Moreover, the compensation arrangement provided for in the Engagement Agreement is consistent with and typical of arrangements entered into by CMAG and other restructuring consulting firms with respect to rendering similar services for clients such as the Debtor.

37.    The Debtor believes that the retention of the CMAG Professionals is a sound exercise of the Debtor's business judgment and is in the best interests of all parties in interest in this Chapter 11 Case.    The Debtor believes that CMAG is well-qualified and able to represent the Debtor in a cost effective, efficient, and timely manner. CMAG has indicated a willingness to act on behalf of the Debtor and to subject itself to the jurisdiction and supervision of the Court.

**D.    Application for Entry of an Order Authorizing Employment and Retention of Locke Lord LLP as Attorneys for the Debtor *Nunc Pro Tunc* to the Petition Date (the "<u>Locke Lord Application</u>").**

38.    The Debtor believes that continued representation by Locke Lord is critical to the Debtor's efforts to reorganize because Locke Lord is extremely familiar with the Debtor's businesses and legal and financial affairs and, accordingly, is well suited to guide the Debtor through the chapter 11 process.  Furthermore, Locke Lord has vast experience and knowledge in the field of debtors' and creditors' rights under chapter 11 of the Bankruptcy Code.

39.    The Debtor desires to employ Locke Lord under a general retainer because of the extensive legal services that will be required in connection with the Debtor's business.  I believe that the services of attorneys under a general retainer are necessary to enable the Debtor to execute faithfully its duties as debtor in possession.  I also believe that the Retainer (defined in the Locke Lord Application) reflect normal business terms in the marketplace.

40.     Other than as set forth above and in the Wirt Declaration (as defined in the Locke Lord Application and attached thereto as <u>Exhibit B</u>), no arrangement is proposed between the Debtor and Locke Lord for compensation to be paid in this case and no agreement or understanding exists between Locke Lord and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with this case.

41.     I believe, and the Debtor submits, that the engagement and retention of Locke Lord on the terms and conditions set forth herein and in the Wirt Declaration and the Engagement Agreement (as defined in the Locke Lord Application and attached to the Wirt Declaration as <u>Exhibit B.1</u>) is necessary and in the best interests of the Debtor, the estate, and the creditors.

**E.     Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (the "<u>Compensation Procedures Motion</u>").**

42.     The Debtor is seeking to establish an orderly and regular process for allowance and payment of interim monthly compensation and reimbursement of expenses for attorneys and professionals in this Chapter 11 Case.

43.     By separate applications, the Debtor has sought authority to employ as Professionals, (i) Locke Lord LLP as counsel for the Debtor, (ii) Polsinelli PC as co-counsel for the Debtor, (iii) pursuant to sections 363 and 105 of the Bankruptcy Code, Carl Marks Advisory Group LLC as restructuring advisor to the Debtor, and (iv) Cain Brothers as investment banker for the Debtor.

44.     The Debtor may need to retain additional Professionals in connection with the continued prosecution of this Chapter 11 Case.  In addition, a statutory committee of unsecured creditors may be appointed in this case pursuant to section 1102 of the Bankruptcy Code, and if so, I believe that such committee will likely retain counsel and possibly other Professionals to

represent it in this case.

45.     I believe that providing notice of the fee applications in the manner described in the Compensation Procedures Motion will permit the parties most active in this Chapter 11 Case to review and respond to professional fees and will save the expense of undue duplication and mailing of lengthy fee applications.

46.     The Debtor will include all payments made to Professionals in accordance with the Interim Compensation Procedures in its monthly operating report.

47.     I believe that the proposed Interim Compensation Procedures (as defined in the Compensation Procedures Motion) will enable the Debtor to closely monitor the costs of administration of this case, maintain a level cash flow, and implement efficient cash management procedures. Moreover, I believe that these procedures will also allow the Court and the key parties in interest, including the Office of the United States Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

48.     I believe that the Chapter 11 Case presents a number of complex issues that, together with the day-to-day administration of the Chapter 11 Case, must be addressed by the Debtor's limited staff and resources. In addition, I anticipate that several Professionals will be involved in this case. Absent streamlined compensation procedures, I believe that the professional fee application and review process could be exceptionally burdensome on the Debtor, the Professionals, the Court, and other parties.

49.     In sum, I believe that the Interim Compensation Procedures will: (i) substantially reduce the burden imposed on the Court by avoiding the need for the immediate review of Monthly Fee Applications; (ii) enable parties in interest to more closely monitor the costs of administration of this Chapter 11 Case; (iii) diminish undue financial burdens on the

Professionals and avoid having Professionals fund the costs of the Chapter 11 Case; and (iv) permit the Debtor to better predict and manage monthly cash costs.

50.     Based on the foregoing, I believe, and the Debtor submits that the relief requested in the Compensation Procedures Motion is necessary and appropriate, is in the best interests of the estate and creditors, and should be granted in all respects.

**F.      Motion of the Debtor for Entry of an Order Authorizing Retention and Payment of Professionals Utilized by Debtor in the Ordinary Course of Business (the "OCP Motion").**

51.     I understand that, by the OCP Motion, the Debtor seeks entry of an order authorizing the Debtor to retain and compensate its ordinary course professionals (each an "*OCP*" and, collectively the "*OCPs*") on a postpetition basis in accordance with the procedures filed with the OCP Motion (the "*OCP Procedures*"), without the need for each OCP to file formal applications for retention and compensation.

52.     The Debtor employs various professionals in the ordinary course of its business. These OCPs provide services for the Debtor in a variety of matters unrelated to this Chapter 11 Case, including specialized accounting and financial services, auditing and tax services, and certain management and consulting services.  A nonexclusive list of the Debtor's current OCPs (the "*OCP List*") is attached to the OCP Motion as Exhibit B.  The Debtor may also seek to employ additional OCPs as necessary in the course of this Chapter 11 Case, subject to the procedures set forth herein.

53.     I believe that the continued employment and compensation of the OCPs is in the best interests of the Debtor's estate, its creditors, and other parties in interest. The OCPs have significant knowledge, expertise, and familiarity with the Debtor and its operations.  Although the Debtor anticipates that the OCPs will wish to continue to represent the Debtor during this Chapter 11 Case, many would not be in a position to do so if the Debtor cannot pay them on a

regular basis.  And without such knowledge, expertise, and familiarity as the OCPs have, the Debtor undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals.  Accordingly, the Debtor's estate and its creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operations of the Debtor's business. Moreover, in light of the number of OCPs, and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, the Debtor submits that it would be impractical, inefficient, and costly for the Debtor and its legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

54.     The OCP Procedures will establish a streamlined process for the retention and compensation of OCPs during this Chapter 11 Case upon notice to the following key parties: (a) the Debtor; (b) proposed counsel to the Debtor; (c) proposed co-counsel to the Debtor; (d) the Office of the U.S. Trustee for the District of Delaware (the "*U.S. Trustee*"); (e) counsel to the Debtor's prepetition and postpetition secured lenders; (f) if appointed, counsel to the Official Committee of Unsecured Creditors; and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "*Notice Parties*").

55.     The OCP Procedures enable the Debtor to employ OCPs upon the filing of a declaration of disinterestedness, which will state that the respective OCP does not have any material interest adverse to the Debtor or its estate.  Additionally, the Notice Parties will have an opportunity to object to any proposed retention pursuant to the OCP Procedures.  The OCP Procedures further provide that fees paid to OCPs, excluding costs and disbursements, will not exceed $50,000 per month, per OCP in the aggregate, calculated as an average over a rolling three-month period, while this Chapter 11 Case is pending (the "*OCP Cap*").  Moreover, the

OCP Procedures provide that the total amount disbursed to any OCP, excluding costs and disbursements, during this Chapter 11 Case shall not exceed $400,000 (collectively, the "*OCP Case Cap*").  The Debtor proposes that the OCP Cap and the OCP Case Cap may be increased by mutual agreement between the Debtor and the U.S. Trustee; *provided* that the Debtor shall file a notice with the Court of any such agreed increase.  Finally, the Debtor proposes that aggregate cap for payments to all OCPs during this Chapter 11 Case shall be $700,000, *provided, however*, that the aggregate cap may be increased (a) by agreement of the Debtor and the U.S. Trustee, or (b) by further order of this Court.

56.    To the extent that fees payable to any OCP exceed the OCP Case Cap, the OCP shall file a fee application (a "*Fee Application*") with the Court for the amount in excess of the OCP Case Cap, in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court, unless the U.S. Trustee agrees otherwise.

57.    Because the OCPs will not be involved in the administration of this Chapter 11 Case, I do not believe that the OCPs are "professionals" requiring formal retention proceedings under section 327 of the Bankruptcy Code.  Instead, the OCPs will provide services in connection with the Debtor's ongoing, ordinary-course business operations, which services are ordinarily provided by non-bankruptcy professionals.  Nevertheless, to provide clarity and an opportunity for oversight, the Debtor seeks the relief requested in the OCP Motion to establish clear mechanisms for retention and compensation of the OCPs pursuant to the OCP Procedures and thereby avoid any subsequent controversy with respect thereto.

58.    I believe that the retention of the OCPs as provided in the OCP Motion is reasonably necessary for the day-to-day operations of the Debtor's business.  Furthermore, the

expenses for the OCPs will be monitored closely by the Debtor, the OCPs will not perform substantial bankruptcy-related services without filing an application with the Court for separate retention as a non-ordinary course professional.

59.     Moreover, in light of the number of OCPs and the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient, and extremely costly for the Debtor and its legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

60.     Therefore, I believe it is in the best interests of all creditors and parties in interest to retain the OCPs in accordance with the OCP Procedures and avoid any disruption in the professional services that are required for the day-to-day operation of the Debtor's business.

**G.      Motion of the Debtor for Entry of an Order Authorizing Debtor to Pay Certain Prepetition Claims of Critical Vendors (the "Critical Vendors Motion").**

61.     The Proton Center provides cancer treatment to critically-ill patients.  I believe that this treatment is important to the lives and welfare of many people, and it is imperative that the operations continue without disruption so that the patients can maintain their quality of care. Operationally, the Debtor relies on goods and services provided by numerous third-party vendors.  These vendors help facilitate the delivery of care at the Proton Center, and as a result, I believe that they are important to the continued and uninterrupted operations of the Debtor's business.

62.     The Debtor is not seeking the authority to pay all the claims of all third parties pursuant to the Critical Vendors Motion.  To the contrary, the Debtor, with the assistance of its advisors (including CMAG Professionals), spent significant time and effort reviewing their accounts payable and vendor lists to identify the limited number of vendors that are clearly

critical to the continued and uninterrupted operations of the Debtor's business (the "***Critical Vendors***").  With the assistance of its advisors (including CMAG Professionals), the Debtor has spent significant time reviewing and analyzing its books and records, consulting management, reviewing contracts, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationship and/or suppliers of goods and services, the loss of which could materially harm its business, reduce its enterprise value, and/or impair going-concern viability.  Specifically, in identifying the Critical Vendors, these parties examined each of its vendor relationship with the following criteria in mind:

- whether a particular vendor is a sole source or service provider;

- whether the services provided by the vendor are so vital, or the vendor's operations area so commingled with the Debtor's business, that even the briefest disruption would cause significant harm to the Debtor's operations;

- whether the Debtor would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether the Debtor's service coverage is sufficient to meet customer demands while an alternative vendor is located;

- whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtor if their prepetition balances are not paid; and

- whether the business relationship between the Debtor and the supplier is governed by a contract.

63.     In addition to these factors, the Debtor and its advisors examined the health of each vendor relationship, each vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process. As a result of this analysis, and although many different types of vendors and third-parties provide goods and services for the Debtor's business, the Debtor is only seeking relief pursuant

to the Critical Vendors Motion with respect to those vendors and service providers that meet the above-referenced criteria and truly are critical to the Debtor's business.

64.     Based on the analysis conducted by the Debtor and its advisors, and pursuant to the Critical Vendors Motion, the Debtor is seeking relief with respect to those Critical Vendors that are highly specialized vendors whose services cannot be replaced quickly or without significant cost to the Debtor's estate, especially during this early, critical juncture in this Chapter 11 Case.  In addition, I believe that the majority of the Critical Vendors are familiar with the Debtor's operations and/or the Proton Center's needs, and, as a result, replacing the Critical Vendors would have a swift and adverse effect on the Debtor's operations, and would likely harm the Debtor's care of its patients.

65.     For example, the Critical Vendors include, but are not limited to, a provider of continuous, specialized, and real-time medical billing services.  I believe that this provider has institutional knowledge of the Debtor's customer base as well as an ongoing, working relationship with the Debtor's management.  I believe that this relationship facilitates the prompt invoicing and collections that are inextricably associated with the Debtor's financial health. Additional Critical Vendors lease or repair the highly-specialized equipment that provides the services that are central to the Debtor's business model.  I believe that an interruption in the availability of this equipment, even for a short while, would materially impair the Debtor's ability to provide services to its patients, many of whom are critically ill and rely upon the Debtor for their treatment.   I believe that preserving the Debtor's access to this highly-specialized equipment, and the maintenance thereof, is critically important to the Debtor's business operations and restructuring efforts.

66.    I believe that replacing the Critical Vendors would not be cost effective or a prudent use of the Debtor's efforts during the critical early stages of this restructuring, and the consequences of potential service interruption would severely eclipse the amount of resources that would have to be devoted to finding adequate, available, and trustworthy alternatives.  In sum, I believe that these Critical Vendors are inextricably linked with the Debtor's operations and contain institutional and specialized knowledge regarding the proper care that the Proton Center requires.

67.    The Debtor currently enjoys favorable trade terms with many of its Critical Vendors.  Given the highly specialized proton therapy industry, I believe, and the Debtor submits, that many of the Critical Vendors may be unfamiliar with the chapter 11 process and unwilling to continue to do business with the Debtor on normal trade terms without relief from the Court with respect to outstanding prepetition claims.  The Debtor will make every effort to obtain continued performance from such vendors and, where applicable, would seek to enforce the automatic stay against vendors who refuse to perform under valid prepetition agreements.  However, due to the integrated nature of the services provided, limited availability of comparable vendors, and length of time it would take to obtain an order enforcing the automatic stay and/or replace such vendor, I believe that it is vitally important that the Debtor continues to receive such services and goods without even the slightest disruption.  I believe, and the Debtor submits, therefore, that it is critical that the Debtor has the discretion to satisfy, if necessary, certain prepetition claims held by Critical Vendors notwithstanding the fact that they may be party to a valid prepetition agreement.

68.    Subject to the Court's approval, the Debtor intends to pay the claims of Critical Vendors (the "***Critical Vendor Claims***") only to the extent necessary to preserve the Debtor's

businesses. The Debtor has designated a core group of advisors who have experience in the Debtor's business, as well as the reorganization process, to review, assess, and potentially recommend payment to a Critical Vendor.

69.     For the reasons stated above, I believe that the potential injury to the Debtor from the disruption caused by a failure to timely honor certain obligations to the Critical Vendors will be far more costly than the unpaid Critical Vendor Claims.   I believe that authorizing the Debtor's payment of the Critical Vendor Claims will help ensure that ongoing services are provided by the Critical Vendors.   I believe that it is crucial to the Debtor's operations that the relief requested in the Critical Vendors Motion be granted.

**H.      Motion for Entry of an Order (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Use of Existing Business Forms; (III) Authorizing Use of Cash Management System; and (IV) Finding the Requirements of 11 U.S.C. § 345(B) to be Satisfied with Respect to the Debtor's Deposit Practices (the "Cash Management Motion").**

70.     As discussed above, the Service Agreement allocates the contractual responsibilities for operating  the Proton Center between the Debtor and Scripps, and this division of responsibility is memorialized in the Services Agreement.

71.     This Services Agreement originally provided the terms for the flow of funds from the medical care payors (whether insurance companies, Medicare, Medicaid, or the patient) to Scripps, and eventually, to the Debtor.  This flow of funds has been amended by the Multi-Party Agreement.   The Debtor has operated in accordance with the resulting cash management system (the "*Cash Management System*") in the ordinary course of its business.   Under this System, the revenues generated from the Proton Center are collected and deposited into two bank accounts maintained by Scripps (respectively, the "*Scripps  Operating  Account*" and the "*Scripps*

***Government Receivables Account***").[7]  On a monthly basis, funds from the Scripps Government Receivables Account are deposited into the Scripps Operating Account.  The funds are then released from the Scripps Operating Account to Scripps, the Debtor, and the Debtor's prepetition secured lenders in accordance with a priority scheme set forth in the Multi-Party Agreement. The priority scheme provides that Scripps shall disburse funds from the Scripps Operating Account, to the extent there are sufficient funds, in the following order:

- ***First***, to Scripps in an amount to satisfy its actual operating expenses for the month as set forth in Section 4.3.1 of the Services Agreement.

- ***Second***, to the extent there are remaining funds, into an ORIX held account (the "***Lender Blocked Account***"), amounts sufficient to pay certain of the Debtor's costs and expenses for operating the Proton Center. These amounts include the taxes and insurance costs incurred by the Debtor in connection with operation the Proton Center,  as well as certain fees that the Debtor is obligated to pay Varian Systems for payments due under the Varian O&M Agreement;

- ***Third***, to the extent there are remaining funds, to the Lender Blocked Account in an amount sufficient to make all loan payments then due and payable to the Debtor's prepetition secured lenders;

- ***Fourth***, to the extent there are remaining funds, *pari passu* and *pro rata* to (i) Scripps in satisfaction of the "Provider Retained Amount" set forth in the Services Agreement; and (ii) into the Lender Blocked Account, an amount for "Priority Ground Rent" due to ORIX SD under the Ground Sublease;

- ***Fifth***, to the extent there are remaining funds, into the Lender Blocked Account, an amount for the "Additional Rent" due to ORIX SD under the Ground Sublease; and

- ***Sixth***, to the extent there are remaining funds, into the Lender Blocked Account as payment of the Management Fee due to the Debtor under the Services Agreement.

72.     Since operations began at the Proton Center, revenues have been insufficient to flow past step two of the priority waterfall.   Accordingly, the Debtor's prepetition secured

---

[7]    These operating accounts are managed by Scripps Health, an affiliate of Scripps.

lenders have not received any payments in satisfaction of their prepetition secured loans to the Debtor, and the revenues have not generated a "Provider Retained Amount" for Scripps or "Priority Ground Rent" to pay the affiliate of ORIX under the Ground Sublease.

73.    The revenues generated by the Proton Center have been used exclusively to pay the operating expenses of Scripps and the Debtor.  When revenues have been insufficient to pay Scripps's operating expenses at step one of the priority waterfall, the Debtor has had to request funds from that certain escrow account (the "***Working Capital Escrow Account***") required under the Services Agreement and established by ORIX pursuant to that certain Cash Management Agreement (the "***Comerica Agreement***") executed on October 21, 2013[8]  by and among the Debtor, Scripps, and ORIX."[9]  When revenues have been insufficient to satisfy the Debtor's operating expenses at step two of the priority waterfall, the Debtor has had to request funds from the Lender Blocked Account (also established pursuant to the Comerica Agreement) to pay these expenses.  When this Lender Blocked Account is depleted of available funds, the Debtor has at times used the proceeds of its prepetition lending facility (the "***Tranche C***") to meet its contractual payment obligations.  At other times, the Proton Center's vendors have been paid directly from the funds held in the Lender Blocked Account or from the proceeds of the prepetition lending facility.  Another ORIX account (the "***Additional Escrow Account***") has provided funds for certain annual expenses including but not limited to expenses relating to taxes and insurance.  The Additional Escrow Account also sometimes served as a conduit for funds being transferred from the Lender Blocked Account to the Debtor's Account (defined below). The Additional Escrow account is now seldom used and contains few funds.

---

[8]    The Debtor and Scripps contemporaneously executed an amendment to the Services Agreement that reflected the terms of the Comerica Agreement.

[9]    ORIX is also the administrative agent under the Debtor's prepetition lending facility.

74.     This Cash Management System is summarized on Exhibit A to the Cash Management Motion.  The bank accounts involved in this Cash Management System are set forth in Exhibit B to the Cash Management Motion (collectively, the "**Bank Accounts**").  Only one such account, the CPTC Operating Account at First Republic Bank (the "**Debtor's Account**") is established by the Debtor.  The other accounts listed on Exhibit A to the Cash Management Motion have been established by Scripps or ORIX, although these accounts are integral to the Cash Management System in the ordinary course.

75.     The Debtor uses the Cash Management System in the ordinary course of its businesses to collect, transfer, and disburse funds generated from operations at the Proton Center and to facilitate cash monitoring, forecasting, and reporting.  The Debtor's proposed Chief Restructuring Officer, with the assistance of a third party accountant (Signature Analytics), oversees the Cash Management System and implements cash management controls for entering, processing, and releasing funds. Additionally, the Debtor supervises the reconciliations of the Debtor's books and records to ensure that all transfers are accounted for properly.

76.     I believe that a waiver of the U.S. Trustee's requirement that the prepetition Debtor's Account be closed and that a new post-petition bank account be opened is necessary.  If enforced in this case, such a requirement would cause enormous disruption in the Debtor's business and would impair the Debtor's efforts to reorganize and pursue other alternatives to maximize the value of its estate.  The Bank Accounts comprise an established cash management system that the Debtor needs to maintain in order to ensure smooth collections and disbursements in the ordinary course.

77.     The Debtor currently has correspondence forms, business forms (including, without limitation, letterhead, purchase orders, and invoices), and checks existing immediately

prior to the Petition Date, that do not refer to the Debtor's status as debtor in possession.

78.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as debtor in possession as a result of the notoriety of this case, the press releases issued by the Debtor, and additional other press coverage.  Moreover, the Debtor's vendors will receive direct notice of the commencement of this case.

79.     I believe that changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor. For these reasons, I believe that the Debtor should be authorized to use existing checks and business forms without being required to place the label "Debtor In Possession" on each.

80.     The cash management procedures utilized by the Debtor constitutes ordinary, usual, and essential business practices and are similar to those used by other major corporate enterprises.  The Cash Management System facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various bank accounts required to effect the collection, disbursement, and movement of cash.

81.     The operation of the Debtor's business requires that the Cash Management System continue during the pendency of this Chapter 11 Case.  I believe that requiring the Debtor to adopt a new, segmented cash management system at this early and critical stage of this case would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive.  Any such disruption could have an adverse impact upon the Debtor's ability to reorganize.  Therefore, I believe that the Debtor should be permitted

to maintain its current Cash Management System, as being in the best interests of the Debtor's estate.

82.    I believe that the Debtor's Account is in a financially stable banking institution. In addition, I believe that the Debtor's Account is in a banking institution with FDIC insurance. Accordingly, I believe that it is in the best interest of the Debtor and its estate to waive the requirements of 11 U.S.C. §345(b).

83.    As discussed above, the Debtor and certain additional parties—primarily Scripps and ORIX—engage in transactions on a monthly basis in accordance with the Cash Management System.  The Debtor believes that it is permitted to engage in these transactions subsequent to the Petition Date in the ordinary course of business.  Nevertheless, out of an abundance of caution, the Debtor seeks authority to continue to participate in these transactions.

84.    The continuance of these transactions in accordance with the Cash Management System is in the best interests of the Debtor's estate because it permits the Debtor to maintain synergies with the parties that are working in concert to fund and operate the Proton Center, which inures to the benefit of the Debtor's creditors.

85.    In light of the efficiencies of the Debtor's centralized Cash Management System, and the delays and expenses associated with altering such system, I believe that it is in the best interest of the Debtor and its estate to permit the continuance of the Cash Management System and ordinary course transactions described here and in the Cash Management Motion.

**I.    Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies and Enter into Premium Financing (the "Insurance Motion").**

86.    In the ordinary course of business, the Debtor maintains insurance policies administered by various third-party insurance carriers (collectively, the "*Insurance Carriers*").

These policies provide coverage for, among other things, the Debtor's property, excess California earthquake risk, general and professional liability, umbrella liability coverage, and directors and officers liability coverage (collectively, the "***Insurance Policies***").  The aggregate annual premium for the Insurance Policies is approximately $490,184, including applicable taxes and surcharges.  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit C.[10]  Each of the Debtor's Insurance Policies renewed on April 23, 2016 and will expire on April 22, 2017, except for the Debtor's directors and officers policies, which renewed on September 30, 2016 and will expire on September 29, 2017.

87.     The Debtor's Property Insurance Policy is paid through 12 monthly installments of $14,132, paid on the 20th of every month, with 3 installments remaining.[11]  The Excess Earthquake, General Liability (Professional Liability, and Umbrella Liability) are funded through insurance premium financing contracted (at the direction of the Debtor) by the Debtor's broker, Harden Insurance Services ("***Harden***"), through First Insurance Funding (the "***Harden Premium Financing***").  The Harden Premium Financing is billed in 10 monthly installments of $17,397.82, with an initial down payment of $36,989.85.  There is one Harden Premium Financing installment that remains to be paid.

88.     The Debtor's directors and officers policies are also funded through insurance premium financing with First Insurance Financing (the "***D&O Policy Premium Financing***" and, together with the Harden Premium Financing, the "***Premium Financing***").  The Debtor's D&O

---

[10]   The descriptions of the Insurance Policies set forth in the Insurance Motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the descriptions in the Insurance Motion.  Although Exhibit C  to the Insurance Motion is intended to be comprehensive, the Debtor may have inadvertently omitted Insurance Policies from Exhibit C, the Debtor requests relief with respect to Insurance Policies payable to all Insurance Carriers, regardless of whether such Insurance Carrier or such Insurance Policy is identified on Exhibit C.

[11]   The Debtor was unable to pay the installment that was due on February 20, 2017.  Accordingly, that installment, and the installments due on March 20, and April 20, 2017 remain to be paid.

Policy Premium Financing is billed in 9 monthly installments of $10,978.52, of which 5 remain to be paid, with an initial down payment of $16,921.20.

89.    The Premium Financing is secured by a security interest in all sums payable to the Debtor under the Insurance Policies including, without limitation, any gross unearned premium, dividend payments, and all payments on account of loss that results in reduction of any unearned premium in accordance with the terms of the insurance policies.  As noted above, the Premium Financing is contracted through First Insurance Funding.

90.    Additionally, the Debtor seeks authority to enter into new Premium Financing arrangements, secured by the Debtor's interest in the financed Insurance Policies themselves, to replace the current Insurance Policies when the current term of the Insurance Policies end (*i.e.*, September 2016 for the D&O polices and April 2017 for the other Insurance Policies).  For the avoidance of doubt, the Debtor only seeks authority to renew its existing Premium Financing and will seek further approval from the Court if the Debtor intends to enter into new Premium Financing arrangements on any terms less favorable than those in the exiting Premium Financing, or with a different financing counterparty.

91.    I am familiar with practice of obtaining financing for business insurance premiums.  It is a standard market practice for Premium Financing to be secured by the insured's interest in the policies being financed, and the Debtor's Premium Financing has historically provided for such a lien.  Unsecured Premium Financing is simply not available in the marketplace, and entering into Premium Financing arrangements provides an efficient way for the Debtor to maintain its insurance coverage and manage its liquidity.  Moreover, the Premium Financing lien will not extend to any other property of the Debtor's estate.

92.     Accordingly, as of the Petition Date, the Debtor estimates that approximately $31,529.82 is immediately due and payable (of which $17,397.82 constitutes the final payment under the Premium Financing, and the balance of $14,132 constitutes the regular monthly premium payment on the Property policy for February 2017). The most recent D&O Policy Premium Financing payment of $10,978.52 was due on February 28, 2017.  Additionally, another monthly payment on the Property policy of $14,132 is due on March 20, 2017, and the last monthly premium payment on the Property policy of $14,132 is due on April 20, 2017. Accordingly, by the Insurance Motion, the Debtor seeks authority to pay a total of $114,686.42 in the aggregate on account of the prepetition Insurance Policies for the Premium Financing and the premiums due under the Insurance Policies to ensure uninterrupted coverage under the Insurance Policies, as follows: interim authority to pay the $31,529.82 presently due on an immediate basis; and (b) final authority, after further notice and a hearing, to pay remaining $83,156.60 in premiums when they come due in March, April, May, and June 2017.

93.     I believe that continuation of the Insurance Policies and payment of the Premium Financing, as well as entry into new insurance policies and premium financing agreements, are essential to the preservation of the value of the Debtor's business and operations.  Moreover, I understand that, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's commercial activities, including, without limitation, the Debtor's proposed debtor-in-possession financing and the requirement under the guidelines promulgated by the U.S. Trustee to maintain adequate insurance coverage to protect property of the estate given the circumstances of the Chapter 11 Case.

94.     The Debtor obtains its Insurance Policies primarily through its insurance broker, Harden, while certain of the surplus lines under the Insurance Policies are handled through

Harden's wholesale brokerage partners, Halcyon and AmWins Brokerage of Georgia, consistent with statutory requirements and IRS tax filing guidelines. Harden assists the Debtor in obtaining comprehensive insurance coverage for its operations, analyzing the market for available coverage and negotiating policy terms, provisions, and premiums. Harden also provides ongoing support through the policy periods. The Debtor pays Harden a commission for services rendered ranging from 10 to 15 percent of the gross policy premiums, depending on the policy. Harden collects the commission payments as part of the premiums paid on the Insurance Policies. As of the Petition Date, the Debtor does not believe that it owes any amounts to Harden on account of fees, commissions, or any other prepetition obligations beyond the commission amounts already contained in the $91,323.04 that the Debtor seeks to pay on account of the Insurance Policies. Out of an abundance of caution, however, the Debtor seeks authority to honor any amounts owed to Harden to ensure uninterrupted coverage under their Insurance Policies.

**J.      Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees (the "Taxes Motion")**

95.      In the ordinary course of business, the Debtor collects, withholds, and incurs income, sales, use, franchise, personal property, real property, business license fees and permits, and certain other taxes and fees, including administrative fees incidental to administering and processing the foregoing obligations (collectively, the "***Taxes and Fees***"). The Debtor remits the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "***Authorities***"). The schedule identifying the Authorities is attached to the Taxes Motion as Exhibit C.[12] The Debtor remits and pays the Taxes and Fees through checks and electronic funds transfers that are processed through their banks and other

---

[12]      Although Exhibit C to the Taxes Motion is intended to be comprehensive, the Debtor may have inadvertently omitted Authorities from Exhibit C. By the Taxes Motion, the Debtor requests relief with respect to Taxes and camp fees payable to all Authorities, regardless of whether such Authority is specifically identified on Exhibit C.

financial institutions.   The Debtor estimates that approximately $4,127.00 in Taxes and Fees have accrued and remain unpaid as of the Petition Date, all of which will become due and owing to the Authorities during the Interim Period.

96.    The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Sought Under Interim Order | Approximate Amounts Sought Under Final Order |
|---|---|---|---|
| Sales and Use Taxes | Taxes imposed on the sale and use of certain goods and services. | $0.00 | $182.00 |
| Income Taxes | Taxes imposed on the Debtor's income and required to be paid to conduct business in the ordinary course. | $0.00 | $13,390.00 |
| Franchise and Other Taxes | Taxes required to conduct business in the ordinary course imposed by state and local Authorities. | $0.00 | $0.00 |
| Personal Property Taxes | Taxes and obligations related to personal property holdings. | $0.00 | $34,142.40 |
| Real Property Taxes | Taxes assessed against the Debtor's real property. | $0.00 | $772,682.58 |
| Business Licenses, Registration, and Other Fees | Fees for business licenses, various permits, and other similar types of licenses and fees associated with conducting business pursuant to state and local laws. | $4,127.00 | $0.00 |
| **Total** | | $4,127.00 | $820,396.98 |

97.    The Debtor pays the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually, or annually depending on the nature and incurrence of a particular Tax or Fee.   Although the Debtor believes that it is substantially current with respect to its payment of Taxes and Fees, the Debtor seeks authority pursuant to the Taxes Motion to make such payments where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition (or were paid in an amount less than actually owed); (c) Taxes and Fees paid prepetition by the Debtor that were lost or otherwise not received in full by any of the

Authorities; or (d) Taxes and Fees incurred for prepetition periods which may become due after the commencement of this Chapter 11 Case.

98.    I believe that failing to pay the Taxes and Fees could materially disrupt the Debtor's business operations in several ways.  *First*, I understand that the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtor's attention from the reorganization process.  *Second*, I understand that failing to pay Taxes and Fees could subject certain of the Debtor's directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtor's restructuring.  *Third*, I understand that failing to pay certain of the Taxes and Fees would likely cause the Debtor to lose its ability to conduct business in certain jurisdictions.  *Fourth*, I understand that unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtor's business.  *Finally*, I understand that the Debtor collects and holds certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds do not constitute property of the Debtor's estate.

**(1)    Sales and Use Taxes**

99.    The Debtor also incurs, collects, and remits sales taxes to the Authorities in connection with its business (collectively, the "***Sales Taxes***").  Additionally, the Debtor purchases a variety of goods necessary for the operation of its business from vendors who may not operate in the state where the property is to be delivered and, therefore, do not charge the Debtor sales tax in connection with such purchases.  In this Chapter 11 Case, applicable law generally requires the Debtor to subsequently pay use taxes on such purchases to the applicable Authorities (collectively, the "***Use Taxes***" and, together with the Sales Taxes, the "***Sales and Use Taxes***").  The Debtor generally remits Sales and Use Taxes on a monthly, quarterly, or

annual basis and in some instances only on occasion such as when a taxable purchase has occurred. The Debtor historically remits approximately $173.16 in the aggregate in Sales and Use Taxes per year to the Authorities. As of the Petition Date, the Debtor estimates that approximately $182.00 in Sales and Use Tax obligations have accrued and remain unpaid, all of which will become due and owing during the Interim Period.

100.    Pursuant to the Final Order, the Debtor also seeks the authority, but not direction, to (a) pay all outstanding prepetition obligations accrued in the ordinary course of business on account of Sales and Use Taxes (approximately $182.00 in the aggregate) and (b) continue negotiating and paying Sales and Use Taxes in the ordinary course of business on a postpetition basis.

### (2)    Income Taxes

101.    In the ordinary course of operating its business, the Debtor incurs state and federal income taxes (collectively "***Income Taxes***"). The Debtor generally remits Income Taxes on a quarterly or annual basis. With respect to the state income taxes, the Debtor remitted payments in an aggregate amount of approximately $26,359.00 for tax year 2015.

102.    As of the Petition Date, the Debtor estimates that approximately $13,390.00 in Income Tax obligations have accrued and remain unpaid, all of which will become due and owing during the Final Period. Pursuant to the Final Order, the Debtor seeks the authority, but not direction, to (a) pay all outstanding prepetition obligations accrued in the ordinary course of business on account of Income Taxes (approximately $13,390.00 in the aggregate) and (b) continue negotiating and paying Income Taxes in the ordinary course of business on a postpetition basis.

### (3)    Franchise and Other Taxes

103.    The Debtor is required to pay various state franchise taxes ("***Franchise Taxes***")

in order to continue conducting its business pursuant to state laws.  State and local Authorities also impose various other taxes against the Debtor's operations including, among others, commercial activity, gross receipts, margin, business enterprise, limited liability entity and business profit taxes (together with the Franchise Taxes, the "***Franchise and Other Taxes***"). The Franchise and Other Taxes are generally assessed against the Debtor measured by the Debtor's business activity.  The Debtor did not pay any Franchise and Other Taxes in 2016 and does not believe that any are due.  The Debtor believes, however, that any Franchise and Other Taxes that the Debtor will be required to pay during this Chapter 11 Case, therefore, will be *de minimis*.

104.    Out of an abundance of caution, however, pursuant to the Final Order, the Debtor seeks the authority, but not direction, to (a) pay all outstanding prepetition obligations accrued in the ordinary course of business on account of Franchise and Other Taxes and (b) continue negotiating and paying Franchise and Other Taxes in the ordinary course of business on a postpetition basis.

### (4)    Personal Property Taxes

105.    I understand that the state and local laws in the jurisdictions where the Debtor operates generally grant Authorities the power to levy property taxes against the Debtor's personal property.  To avoid the imposition of statutory liens on its personal property, the Debtor typically pays personal property taxes ("***Personal Property Taxes***") in the ordinary course of business on an annual or semi-annual basis.  The Debtor has historically remitted approximately $34,000 in Personal Property Taxes per year to the applicable Authorities.  As of the Petition Date, the Debtor believes it will owe approximately $34,142.40 for Personal Property Taxes that will come due during the Final Period, and seeks authority to pay this amount pursuant to the Final Order.

### (5)    Real Property Taxes

106.    In the ordinary course of operating its business and owning its real property, the Debtor is required to pay real property taxes assessed by San Diego County, California ("***Real Property Taxes***").  Property tax bills for the year are mailed in late September or early October. The first installment is due on November 1, and the second installment is due on February 1 of the following year and becomes delinquent after April 10.  The second installment of Real Property Taxes for 2016 will come due on February 1, 2017 in the amount of $772,682.58, and the Debtor intends to pay this amount before it becomes delinquent on April 10, 2017.  By the Motion, the Debtor seeks authority, but not direction to pay the Real Property Taxes in the amount of $772,682.58 pursuant to the Final Order, and to negotiate and pay Real Property Taxes in the ordinary course of business on a postpetition basis.

### (6)    Business Licenses, Registrations, and Other Fees

107.    In the ordinary course of operating its business, the Debtor is required to pay various fees for business licenses, registrations, environmental fees, and other similar types of permits and fees (the "***Business Fees***") in order to continue conducting its business.  As of the Petition Date, Business Fees are paid to local and state Authorities, including without limitation, California.  The Debtor typically pays the Business Fees quarterly or annually.  In 2016, the Debtor paid approximately $4,200 in Business Fees.  As of the Petition Date, the Debtor estimates that it has incurred or collected approximately $4,127.00 in Business Fees that have not been remitted to the relevant Authorities all of which will become due and owing during the Interim Period.

### (7)    Payment of Taxes and Fees

108.    Pursuant to the Taxes Motion, the Debtor seeks the authority, but not direction, on an interim basis to (a) pay all outstanding prepetition obligations accrued in the ordinary course

of business on account of Business Fees that become due and owing during the Interim Period (approximately $4,127.00 in the aggregate) and (b) continue negotiating and paying Business Fees in the ordinary course of business on a postpetition basis. Moreover, the Debtor seeks the authority, but not direction, on a final basis to (a) pay all outstanding prepetition obligations accrued in the ordinary course of business on account of Business Fees in the aggregate) and (b) continue negotiating and paying Business Fees in the ordinary course of business on a postpetition basis.

109.    I believe that the Debtor's ability to pay the Taxes and Fees is critical to its continued and uninterrupted operations. I understand that if certain Taxes and Fees remain unpaid, the Authorities may seek to recover such amounts directly from the Debtor's directors, or officers, thereby distracting such key personnel from the administration of the Debtor's Chapter 11 Case.

110.    I believe that any collection action on account of such claims, and any potential ensuing liability, would distract the Debtor and its personnel to the detriment of all parties in interest. The dedicated and active participation of the Debtor's officers and directors is integral to the Debtor's continued operations and essential to the orderly administration and, ultimately, the success of this Chapter 11 Case.

111.    Furthermore, I understand that the Debtor's obligation to pay the Taxes and Fees may ultimately result in increased tax liability for the Debtor if interest and penalties accrue on the Tax and Fee claims, which amounts may also be entitled to priority treatment. I believe that such a result would be contrary to the best interests of the Debtor's estate and all stakeholders. As noted above, I understand that many of the Taxes and Fees may be entitled to priority status pursuant to the Bankruptcy Code. I understand that, as priority claims, these obligations must be

paid in full before any general unsecured obligations of the Debtor may be satisfied.  To the extent that the Debtor is not able to timely pay the prepetition Taxes and Fees, I believe that it may ultimately be required to pay those amounts with additional interest and penalties.  I believe that the Debtor's failure to pay the prepetition Taxes and Fees as they come due may, thus, ultimately increase the amount of priority claims held by the Authorities against the Debtor's estate to the detriment of the Debtor's general unsecured creditors.

**K.**  **Motion of the Debtor for Entry of an Interim Order Pursuant to 11 U.S.C. §§ 106, 361, 362, 363, 364 and 507, Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 and Del. L. R. Bankr. P. 400102 (I) Authorizing Debtor and Debtor in Possession to Obtain First Priority and Priming Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief (the "<u>DIP Financing Motion</u>").**

112.    I believe that the preservation of the value of the Debtor's business, the ability to continue providing care to patients at the Proton Center, and the success of the timing of the Debtor's reorganization efforts hinge on obtaining immediate access to sufficient postpetition financing.  I further believe that the Debtor's ability to conduct a potential sale depends heavily upon the immediate approval of the DIP Financing Motion.  The Debtor intends to use the funds sought thereunder, among other things, to fund its operations and to explore the potential sale of all or substantially all of its assets.

113.    Due to the fact that virtually all of the Debtor's cash constitutes cash collateral, and substantially all of its non-cash assets are subject to the Prepetition Liens and security interests of the Prepetition Secured Parties and Varian Systems, I believe that the Debtor is currently without sufficient unencumbered funds with which to pay ongoing operating expenses necessary to administer the Chapter 11 Case.  I believe that the Debtor's immediate access to the proposed DIP Facility is necessary in order to administer the Chapter 11 Case, provide cancer

treatment to the Proton Center's patients, preserve and maximize the value of the Debtor's assets and estate for the value of creditors, potentially consummate a sale of substantially all of its assets, and avoid immediate and irreparable harm to the Debtor's estate and creditors.

114.    As a result of extensive arm's-length negotiations conducted by the Debtor and the DIP Secured Parties, the DIP Secured Parties have agreed and consented to provide the Debtor with the DIP Facility and to permit the Debtor to use their cash collateral during the interim postpetition period pursuant to the terms of the DIP Loan Documents and the Interim Order, pending a Final Hearing.  I believe that these financial accommodations should enable the Debtor to commence, and continue to administer in an orderly fashion, the Chapter 11 Case, while exploring the potential sale of substantially all of the Debtor's assets.

115.    Leading up to the Chapter 11 Case, the Debtor explored strategic alternatives and engaged in extensive negotiations with its secured lenders and principal creditors in an effort to obtain additional liquidity.  Given the immediacy of the Debtor's financing needs, and the existing Prepetition Liens, the Debtor and its professionals determined that additional unsecured financing was not available.  Indeed, I believe that no party (other than the DIP Secured Parties) was in a position to provide debtor in possession financing that satisfied the Debtor's needs and on terms and conditions more favorable to the Debtor than those provided by the DIP Secured Parties.  Thus, the Debtor was unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Debtor's assets junior to the Prepetition Liens or on better terms than those provided by the DIP Secured Parties. Thus, based on the foregoing, I believe and the Debtor submits that the Debtor has satisfied the requirement to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code and their proposed grant of adequate protection

to the Prepetition Secured  Parties and Varian Systems is appropriate.

116.    Faced with these circumstances, and given the inability to find other postpetition financing on terms and conditions more favorable to the Debtor than those provided by the DIP Secured Parties, the Debtor engaged in good faith, arm's-length negotiations with the DIP Secured Parties over the course of several weeks, which culminated in the DIP Facility, the Term Sheet, the Budget, and the form of the proposed Interim Order.  During these negotiations, the Debtor, with the assistance of its advisors, went to great lengths under difficult circumstance to achieve the best deal possible for itself and its constituencies.

117.    In this challenging credit market, the Debtor has been unable to find alternate or better financing on the terms and of the type and magnitude required in the Chapter 11 Case on an unsecured basis, or without offering terms substantially similar or better to those provided under the DIP Loan Documents.  The Debtor ultimately decided that the proposal for debtor in possession financing advanced by the DIP Secured Parties was the most favorable under the circumstances, because it: (a) could be documented and accessed quickly; (b) adequately addresses the Debtor's reasonably foreseeable liquidity needs; and (c) maintains the going concern value of the Debtor's business and the quality of care for the Proton Center's patients. Given the Debtor's circumstances, I believe that the terms of the DIP Facility, as set forth in the Term Sheet, the Interim Order, and the DIP Loan Documents, are fair, reasonable, and adequate. For the foregoing reasons, I believe, and the Debtor respectfully submits that entry into the DIP Loan Documents is in the best interests of its estate, creditors, and other parties in interest.

118.    With respect to Scripps, I believe that Scripps's interest in the Proton Center is adequately protected under the DIP Facility.  In the absence of the DIP Facility, I believe that the Proton Center would be non-operational, rendering Scripps' interest worthless.  By keeping the

Proton Center operational during this restructuring, I believe that the DIP Facility is providing Scripps with an opportunity to realize value from its interest that would not be available in the absence of the DIP Facility.

119.    The Debtor believes that the provisions of the Interim Order and the Term Sheet that are specifically discussed in Section IV.B of the DIP Financing Motion are required to be identified in accordance with Local Bankruptcy Rule 4001-2 and that such provisions are justified and necessary in the context and circumstances of this Chapter 11 Case.

120.    The $16 million Rollup is a material component of the structure of the DIP Facility and was required by the DIP Secured Parties as a condition to their commitment to provide postpetition financing.  Absent the DIP Facility, I believe that the Debtor's ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  Given these circumstances, I believe that the Rollup is reasonable, appropriate, and a sound exercise of the Debtor's business judgment.

121.    I believe that the DIP Facility and the use of Cash Collateral are necessary for the Debtor's reorganization, and the such funds can only be obtained on terms acceptable to the DIP Secured Parties; a condition of such consent is the relatively standard Challenge Period contained in the Interim Order and described in the DIP Financing Motion.  Absent such Challenge Period, I believe that the Debtor will have no cash to operate its business, and it will quickly be forced to shut down, thereby destroying its going concern value to the detriment of all parties, most notably the patients who receive treatment at the Proton Center, as well as the Debtor's creditors.  Thus, I believe that extraordinary circumstances – the necessity of the DIP Facility and the use of Cash Collateral – warrant the entry of the Interim Order.

122.    I believe that immediate and irreparable harm would result if the relief requested in the DIP Financing Motion is not granted on an interim basis.  I further believe that the Debtor needs to access liquidity under the DIP Facility in order to, among other things, satisfy its working capital and operational needs and preserve the going concern value of the Debtor's estate.  I believe that funding these expenditures is necessary to the Debtor's ability to preserve its values for the benefit of all parties in interest pending a potential sale of the Debtor's assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge and belief.

Executed on March 1, 2017

By: */s/ J. Jette Campbell*
Name: J. Jette Campbell
Title: Chief Restructuring Officer