## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CALIFORNIA PROTON TREATMENT CENTER, LLC[1] | ) | Case No. 17-_____ (__) |
|  | ) |  |
| Debtor. | ) | **Re: Docket No. ___** |
|  | ) |  |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, FED. R. BANKR. P. 2002, 4001, 6004 AND 9014 AND DEL. L. R. BANKR. P. 4001-2 (I) AUTHORIZING DEBTOR AND DEBTOR IN POSSESSION TO OBTAIN FIRST PRIORITY AND PRIMING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of California Proton Treatment Center, LLC, as debtor and debtor in possession in the above-captioned case (the "Debtor") for entry of an interim order (this "Interim Order") and a final order (the "Final Order") under sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), *inter alia* (a) authorizing the Debtor to obtain first priority and priming postpetition financing in the form of a multiple-draw term loan facility as set forth in the term sheet attached as Exhibit A

---

[1]     Pursuant to 11 U.S.C. § 342(c)(1), the last four digits of the Debtor's federal tax identification number are: 9073. The location of the Debtor's place of business and its address for notice purposes is 9730 Summers Ridge Rd, San Diego, CA 92121, Attn: Wilson Williams, Manager.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Term Sheet or DIP Motion, as applicable.

to this Interim Order (the "DIP Term Sheet"), by and between the Debtor, ORIX Capital

Markets, LLC, as the administrative agent (in such capacity, the "DIP Administrative Agent"),

and the lenders party thereto (the "DIP Lenders," and, together with the DIP Administrative

Agent, the "DIP Secured Parties"), of up to $32,560,000.00 (inclusive of the Rollup Amount

(defined below) and the Upfront Fee Amount (defined below)) (the "DIP Facility"), of which

$2,380,000 plus the Upfront Fee Amount shall be available on an interim basis, under the terms

of this Interim Order and DIP Loan Documents (as defined below), (b) subject to entry of the

Final Order (defined below), authorizing a partial rollup of the Prepetition Facility (defined

below), in an amount equal to $16,000,000.00, into the DIP Facility, (c) granting security

interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the

Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the

DIP Administrative Agent, for the benefit of DIP Secured Parties, on the DIP Collateral (as

defined below) to secure all obligations of the Debtor under and with respect to the DIP Facility,

(d) allowing superpriority administrative expense status (including pursuant to sections

364(c)(1), 503(b) and 507(b) of the Bankruptcy Code) of the DIP Obligations in the Debtor's

chapter 11 case (the "Chapter 11 Case"), (e) authorizing the Debtor to execute and deliver

additional documentation consistent with the terms of (or as may be required by) the DIP Term

Sheet (such documents, together with the DIP Term Sheet, the "DIP Loan Documents"), and to

perform such other and further acts as may be required in connection with the DIP Loan

Documents, (f) authorizing the use of Cash Collateral (as defined below) by the Debtor effective

as of the Petition Date, (g) vacating and modifying the automatic stay imposed by section 362 of

the Bankruptcy Code to the extent necessary to implement and effectuate the terms and

provisions of this Interim Order and the Final Order, (h) granting adequate protection to ORIX

2

Capital Markets, LLC, as the prepetition agent (in such capacity, the "Prepetition Agent"), for its benefit and for the benefit of the lenders under the Prepetition Loan Agreement (as defined below) (the "Prepetition Lenders;" together with the Prepetition Agent, the "Prepetition Secured Parties"), (i) granting certain adequate protection to Varian Medical Systems, Inc. ("Varian") in its capacity as the seller and financer of the Proton Equipment Collateral (defined below),  (j) scheduling an interim hearing on this Motion and authorizing, from the entry of this Interim Order until the final hearing on this Motion (the "Final Hearing"), *inter alia*, the Debtor to obtain credit and use Cash Collateral subject to the terms and conditions set forth in the DIP Loan Documents; (k) scheduling the Final Hearing to consider entry of the Final Order, and (l) granting related relief; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and the Court having found that the Debtor's notice of the Motion and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court on _____, _____ (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion, the *Declaration of J. Jette Campbell in Support of Chapter 11 Petition and First Day Pleadings of California Proton Treatment Center, LLC* [Docket No. ___] (the "First-Day Declaration"), and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND CONCLUDED THAT:

    A.    <u>Disposition</u>.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim

Order that have not been withdrawn, waived or settled are hereby denied and overruled in their entirety.

B.    <u>Commencement of Cases</u>.    On February 28, 2017 (the "<u>Petition Date</u>"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is in possession of its properties and is continuing to operate its business as a debtor and debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.   No official committee of unsecured creditors (a "<u>Committee</u>") has been appointed in the Chapter 11 Case.

C.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2.

D.    <u>Adequate Notice</u>.  On the Petition Date, the Debtor filed the Motion with this Court pursuant to Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2, and provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the U.S. Trustee; (b) counsel to the DIP Administrative Agent and the Prepetition Agent; (c) creditors holding the twenty (20) largest unsecured claims as set

4

forth in the consolidated list filed with the Debtor's Chapter 11 petition; and (d) all parties requesting service in this Chapter 11 Case pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Given the nature of the relief sought in the Motion, this Court concludes that the foregoing notice complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable law, and no further notice relating to the interim hearing on this Motion is necessary or required.

       E.    <u>Stipulations</u>.    After consultation with their attorneys and financial advisors, subject to and without prejudice to the rights of any Committee and any other party with standing as set forth in Paragraph 35 below, the Debtor admits, stipulates, and agrees to the following, and make the releases and waivers set forth below, on and as of the Petition Date:

          i.    The Debtor is party to that certain Loan and Security Agreement, dated as of September 30, 2011, by and among the Debtor, as borrower, the Prepetition Agent, and the Prepetition Lenders from time to time party thereto (in each case as amended, supplemented or otherwise modified prior to the date hereof, including pursuant to the Forbearance Agreement and Consent to Secondment dated as of November 6, 2015, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Facility"; and together with any other agreements, instruments, notes, guaranties and other documents related thereto, collectively, the "Prepetition Loan Documents").  All obligations of the Debtor arising under the Prepetition Loan Agreement, the Prepetition Loan Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations in the

#4818-4498-0029

performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to herein collectively as the "Prepetition Obligations").

ii.   Pursuant to the Prepetition Loan Documents, prior to the Petition Date, the Debtor granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, to secure the Prepetition Obligations, a valid and perfected first priority security interest in and continuing lien on (all such security interests and liens, collectively, the "Prepetition Liens") substantially all of the Debtor's assets, including (a) the Collateral (as defined in the Prepetition Facility), (b) all real property and all improvements thereon, (c) all funds of the Debtor on deposit from time to time with the Prepetition Agent or any agent of the Prepetition Agent or on deposit in any depository account controlled by Prepetition Agent, including without limitation, all Deposits (as defined in the Prepetition Facility), and (d) all Personal Property, including, without limitation, all of the Debtor's personal property, fixtures, attachments and equipment located upon, attached to, used or required to be used in connection with the operation of the Property, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Electronic Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, and Supporting Obligations (each as defined in the

6

#4818-4498-0029

Prepetition Facility), and all replacements, substitutions, and additions to such property and all proceeds thereof (collectively, the "Prepetition Collateral").

iii.  All Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against the Debtor. With respect to the Prepetition Collateral, the Prepetition Secured Parties have valid, duly-authorized, perfected, enforceable, non-voidable and binding security interests in, and liens on, substantially all of the Prepetition Collateral as of the Petition Date, including the Cash Collateral. The Debtor further admits, acknowledges and agrees that (i) the Prepetition Obligations constitute legal, valid and binding obligations of the Debtor, (ii) no offsets, defenses or counterclaims to the Prepetition Obligations exist, and (iii) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

iv.  The Debtor has no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Secured Parties with respect to the Prepetition Loan Documents, whether arising at law, in contract or at equity, including any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.

v.  As of the Petition Date, the Prepetition Obligations for which the Debtor, without defense, counterclaim or offset of any kind, was truly and justly

7

indebted to the Prepetition Secured Parties is: (i) not less than $180,739,882.28, which consists of aggregate principal amount of the Prepetition Obligations (including not less than (x) $161,384,352.73 in outstanding principal of Tranche A Notes, (y) $9,749,646.04 in outstanding principal of Tranche B Notes (as defined in the Prepetition Facility), and (z) $9,605,883.51 in outstanding principal of Tranche C Notes (as defined in the Prepetition Facility)), (ii) certain protective advances made by the Prepetition Secured Parties, (iii) accrued and unpaid interest (including at the default rate), and certain costs, fees and charges (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents), and (iv) additional amounts to be determined now or hereafter due under the Prepetition Loan Documents.

vi.     The Debtor does not have, and hereby forever releases and waives, any claims, objections, challenges, counterclaims, causes of action, defenses, setoff rights, obligations, rights to subordination or any other liabilities, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or in equity, against the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time through the Petition Date.

8

vii.     Due to the commencement of this Chapter 11 Case, the Debtor is in default with respect to their Prepetition Obligations and an Event of Default has occurred under the Prepetition Loan Documents

F.      Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include any and all "cash collateral" as defined in section 363 of the Bankruptcy Code, in which the Prepetition Agent, on its behalf and on behalf of the Prepetition Lenders, has a lien or security interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or any Final Order, or otherwise.

G.      Use of DIP Facility.  The Debtor has an immediate and critical need to use the DIP Facility to preserve and operate its business and effectuate a reorganization of its business, which will be used in accordance with the terms of this Interim Order and the DIP Loan Documents and subject to the DIP Budget (as defined below).  Without the use of the DIP Facility, the Debtor will not have sufficient liquidity to be able to continue to operate its business.  Absent authorization to immediately use the DIP Facility, the Debtor's estate and its creditors would suffer immediate and irreparable harm.

H.      Use of Cash Collateral.  The Debtor has an immediate and critical need to use the Cash Collateral to preserve and operate its business and effectuate a reorganization of its business, which will be used in accordance with the terms of this Interim Order and the DIP Loan Documents and subject to the DIP Budget.  Without the use of the Cash Collateral, the Debtor will not have sufficient liquidity to be able to continue to operate its business.  Absent authorization to immediately use the Cash Collateral, the Debtor's estate and its creditors would suffer immediate and irreparable harm.

I.      Other Financing Unavailable.  As discussed in the First-Day Declaration, the Debtor is unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code or (ii) adequate credit secured by (x) a senior lien on unencumbered assets of its estate under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets of its estate under section 364(c)(3) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The only available source of credit available to the Debtor is the DIP Facility.  The Debtor requires both the financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order in order to satisfy its post-petition liquidity needs.  Subject to entry of the Final Order, the partial rollup of the Prepetition Facility upon the terms and conditions set forth in the DIP Loan Documents is in the best interests of the Debtor and its estate.

J.      Priming Liens.  The security interests and liens granted pursuant to this Interim Order to the DIP Administrative Agent, for the benefit of the DIP Secured Parties, are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtor's estates, (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted pursuant to this Interim Order to the DIP Administrative Agent, for the benefit of the DIP Secured Parties, and/or (iii) the interests of any holder of a valid, perfected, prepetition security interest or lien are otherwise adequately protected.

K.      Consent of the Prepetition Secured Parties.  The consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens (defined below) and use of the

Prepetition Collateral, including Cash Collateral, by the Debtor is limited to this Interim Order and the DIP Facility presently before the Court, with ORIX Capital Markets, LLC as DIP Administrative Agent, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility.  Furthermore, the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens and use of the Prepetition Collateral, including Cash Collateral, by the Debtor does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise.

L.    <u>Good Cause for Immediate Entry</u>.  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.  In particular, the authorization granted herein for the Debtor to enter into the DIP Facility, to continue using Cash Collateral and to obtain interim financing, including on a priming lien basis as set forth herein, is necessary to avoid immediate and irreparable harm to the Debtor and its estate.  Entry of this Interim Order is in the best interest of the Debtor, its estate and creditors.  The terms of the DIP Facility are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.    <u>Arm's Length Negotiation; Good Faith</u>.  The DIP Secured Parties have indicated a willingness to provide the Debtor with financing solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Court, the Final Order), and the DIP Loan Documents.  The Debtor and the DIP Secured Parties have negotiated the terms and conditions of the DIP Facility and this Interim Order in good faith and at arm's length.  After considering all of their alternatives, the Debtor has concluded, in an exercise of its sound business judgment,

11

that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order (and, subject to entry by the Court, the Final Order) and the DIP Loan Documents represents the best financing presently available to the Debtor.  The DIP Administrative Agent and each of the DIP Lenders are good faith financiers.  The DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims  and all of the obligations and indebtedness arising under, in respect of or in connection with the DIP Facility, the DIP Loan Documents and this Interim Order, including without limitation, all loans made to the Debtor pursuant to the DIP Loan Documents and this Interim Order, all "DIP Obligations" as that term is defined in the DIP Term Sheet, and any other obligations under the DIP Loan Documents and this Interim Order (all of the foregoing, collectively, the "DIP Obligations"), shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Loan Documents, the DIP Liens, the DIP Obligations and the DIP Superpriority Claims (as defined below), shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code and the terms, conditions, benefits and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified or otherwise is no longer in full force and effect or the Chapter 11 Case is subsequently converted or dismissed.

N.    Adequate Protection for the Prepetition Secured Parties.  The Prepetition Secured Parties are entitled to adequate protection as provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code based on, among other things, the priming of the Prepetition Liens, the imposition of the automatic stay and the Debtor's continued use of the Prepetition Collateral (including the Cash Collateral).  The adequate protection provided herein has been consensually agreed to by the Debtor, the DIP

12

Secured Parties and the Prepetition Secured Parties, provided that (i) the Court is not making any findings that the Prepetition Secured Parties are in fact adequately protected and (ii) the Prepetition Secured Parties have expressly reserved their right to seek additional adequate protection at any time.

O.    <u>Adequate Protection for Varian Medical Systems, Inc.</u>  Varian, in its capacity as the seller and financer of certain equipment (the "<u>Proton Equipment Collateral</u>") pursuant to the Purchase Agreement (defined below), is entitled to adequate protection as provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code based on, among other things, the priming of the liens and security interests in the Proton Equipment Collateral granted by the Debtor in favor of Varian (the "<u>Varian Prepetition Liens</u>") in connection with that certain Proton System Purchase Agreement, dated April 29, 2010, by and among the Debtor and Varian (as amended, modified or supplemented, the "<u>Purchase Agreement</u>"), the imposition of the automatic stay, and the Debtor's continued use of the Proton Equipment Collateral.  The adequate protection provided of Varian's interests has been consensually agreed to by the Debtor and Varian, provided that (i) the Court is not making any findings that Varian is in fact adequately protected and (ii) Varian has expressly reserved its right to seek additional adequate protection at any time.

P.    <u>Order of the Court</u>.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Motion Granted</u>.  The Motion is granted on an interim basis, subject to the terms set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby denied and overruled in their entirety on their merits.  This Interim Order shall be valid, binding on all parties in interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062 and 9014.

2.      <u>Authority to Enter into DIP Facility</u>.  The Debtor is hereby authorized to incur and perform the DIP Obligations arising from and after the date of this Interim Order under the DIP Facility, on the terms set forth in this Interim Order, the DIP Loan Documents (including, without limitation, the DIP Term Sheet) and such additional documents, instruments and agreements as may be reasonably required by the DIP Secured Parties to implement the terms or effectuate the purposes of and transactions contemplated by the DIP Loan Documents.  The Debtor is hereby authorized to execute and deliver the DIP Loan Documents (including, without limitation, the DIP Term Sheet), the terms of which are incorporated herein by reference, and borrow money under the DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $2,380,000 plus the Upfront Fee Amount (the "<u>Interim Availability</u>"), all in accordance with the terms of this Interim Order and the other DIP Loan Documents.  Prior to entry of the Final Order, the DIP Term Sheet and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtor by the DIP Secured Parties in respect of the Interim Availability.  Following entry of the Final Order, the financial and credit accommodations to be provided to the Debtor by the DIP Secured Parties in respect of the DIP

#4818-4498-0029

Facility (including amounts borrowed under the Interim Availability) shall be governed by the DIP Term Sheet, any other DIP Loan Documents and the Final Order.

       3.      <u>Use of Cash Collateral and Proceeds of DIP Facility; Rollup of Prepetition Facility</u>.  The Debtor is hereby authorized to use Cash Collateral and the proceeds of any borrowings under the DIP Facility strictly in accordance with the DIP Budget (as may be amended from time to time with the consent of the DIP Administrative Agent in accordance with this Interim Order and the DIP Loan Documents) and the other terms and conditions set forth in this Interim Order and the DIP Loan Documents, including, without limitation:  (i) upon the entry of the Final Order, to repay a portion of the Prepetition Facility, in the amount of $16,000,000.00 (the "<u>Rollup Amount</u>"), which amount will be applied (x) *first*, to the Tranche C Notes and (y) *second,* to a pro rata portion of the aggregate outstanding principal of Tranche A Notes in accordance with the DIP Term Sheet, (ii) to pay all fees due to the DIP Secured Parties and all professional fees and expense (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Secured Parties, including those incurred in connection with the preparation, negotiation, documentation and Court approval of the DIP Facility, including, without limitation, the fees set forth in Annex III of the DIP Term Sheet, provided that, upon the Closing Date (as defined in the DIP Term Sheet), the amount of each DIP Lenders' respective Upfront Fee (as defined in Annex III of the DIP Term Sheet) shall be ratably added to such DIP Lenders' then-outstanding DIP Loans and shall constitute principal thereof for all purposes under this Interim Order and the DIP Loan Documents (such amount the "<u>Upfront Fee Amount</u>"), (iii) to make all adequate protection payments to the Prepetition Secured Parties as set forth herein, and (iv) to provide working capital, and for other general corporate purposes of the Debtor, and to pay administration costs of the Chapter 11 Case and

15

claims or amounts approved by the Bankruptcy Court.  The Debtor shall not distribute, convey or pay any proceeds of the DIP Facility or any Cash Collateral to any of the Debtor's direct or indirect equity owners.  Upon the entry of the Final Order, the Prepetition Obligations, solely in the Rollup Amount, shall be deemed issued and outstanding under the DIP Loan Documents as DIP Obligations.

4.    Validity of DIP Loan Documents.  The DIP Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor in accordance with the terms thereof and the terms of this Interim Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code (to the extent permitted by applicable law) or after dismissal of any Chapter 11 Case.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, reduction, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

5.    DIP Budget.  The initial DIP Budget annexed hereto as Exhibit B (as updated from time to time in accordance with the DIP Loan Documents) (the "DIP Budget") is approved. Proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtor only in accordance with the DIP Budget (subject to the Permitted Deviations (defined below)), the DIP Loan Documents and this Interim Order.  The DIP Budget may be updated and amended from time to time without further order of the Court solely by agreement between the

16

Debtor and the DIP Lenders in accordance with the terms of the DIP Loan Documents; provided, however, that if a line item is not approved by the DIP Lenders it shall be deemed to be as set forth in the most recent Budget satisfactory to the DIP Lenders and any line item approved for a specific Budget Test Period (as defined in the DIP Term Sheet) and that the Debtor has diligently pursued the use thereof, but due to the collection policies of a third party is not fully utilized in such Budget Test Period may be used in the succeeding Budget Test Period to pay such third party; provided further that budgeted amounts with respect to estate professionals fees and expenses that have accrued but not yet been paid in a particular Budget Period due to the fee compensation and expense reimbursement procedures set forth in the Local Rules or established by order of the Court (the "Professionals Compensation Procedures") shall, to the extent such fees are allowed in accordance with the Professionals Compensation Procedures, be permitted to accrue and be available in all subsequent Budget Periods, up to and including the final resolution of any final fee applications in the Chapter 11 Case, until such amounts are paid.

      6.    <u>Permitted Deviation</u>.  The Debtor shall not permit:

      (a)    The actual aggregate amount of Revenues (as defined in the Prepetition Facility) collected in the first Budget Test Period beginning on March 1, 2017 to be less than $1,345,000.  For all subsequent Budget Test Periods, the Borrower will not permit the actual aggregate amount of Revenues collected to be less than 90% of the budgeted amount for such Budget Test Period set forth in the Budget and each previous Budget Test Period set forth in the Budget (the "Revenue Permitted Deviation"); and

      (b)    The actual aggregate amount of disbursements of line items set forth in the Budget to be more than 110% of the aggregate budgeted amount for such Budget Test Period set forth in the Budget and each previous Budget Test Period set forth in the Budget

17

("Disbursements Permitted Deviation"; together with the Revenue Permitted Deviation, the "Permitted Deviations"); provided, however, that the budgeted amounts for the DIP Secured Parties' Fees and Expenses (defined below) will not be subject to any limitations on account of Disbursements Permitted Deviations, and any DIP Secured Parties' Fees and Expenses paid in excess of the budgeted amounts for such items shall not constitute an Event of Default under the Interim Order or any of the DIP Loan Documents; provided, further, for the avoidance of doubt, that fees and expenses paid to Varian under the Maintenance Agreement (as defined in the DIP Term Sheet) shall be included in the Budget as "disbursements".

7.      Financial Reporting.  The Debtor (a) shall deliver a monthly report/reconciliation to the DIP Secured Parties on the seventh (7th) day of the immediately preceding month, the actual and budgeted results for such month by line item in the Budget and the cash receipts, together with a reasonably detailed written explanation of all Permitted Deviations, which report shall be in form and substance satisfactory to the DIP Lenders and the Debtor ("Reconciliation Report"); (b) shall notify the DIP Administrative Agent as soon as reasonably practicable if the Debtor anticipates that it will exceed the Permitted Deviation for any Budget Test Period; (c) shall obtain from Scripps (defined below) (or any entity acting as the successor to Scripps) and provide to the DIP Administrative Agent and the DIP Lenders, a detailed monthly accounting of the revenues and receipts generated or otherwise received by, and the costs and expenses incurred by, Scripps in connection with the clinical and medical operations at the Facility (as defined in the Prepetition Facility); and (c) shall provide any other reporting as reasonably required by the DIP Administrative Agent and/or Required DIP Lenders, which the DIP Administrative Agent shall make available to the DIP Lenders.

18

8.      <u>DIP Liens and DIP Collateral</u>. As security for the full and timely payment of the DIP Obligations, the DIP Administrative Agent on its behalf and on behalf of the DIP Lenders is hereby granted, subject to the Carve-Out (as defined below), the following liens and security interests on the DIP Collateral:

i.      pursuant to Bankruptcy Code section 364(d)(1) a first-priority, valid and perfected, priming lien and security interest in on all encumbered property of the Debtor and its estate, which lien and security interest shall be senior to any existing liens, claims, interests or encumbrances; <u>provided</u> that such priming lien shall be subject to (A) the matters expressly identified on Annex II to the DIP Term Sheet, (B) a valid, non-avoidable lien that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, or (C) a valid, non-avoidable lien that was senior to the Prepetition Liens on the Petition Date (but excluding any liens or security interests granted to or for the benefit of Scripps (defined below)) (the foregoing clauses (A)-(C) being referred to collectively as the "<u>Permitted Exceptions</u>"); <u>provided</u>, <u>further</u>, that all liens and security interests granted and/or described herein shall prime and be senior to (1) any alleged leasehold or other right, claim, title or interest in any property of the Debtor pursuant to the Ground Lease (as defined in the Prepetition Facility) or the Ground Sublease (as defined in the Prepetition Facility) or of Scripps Medical Group, Inc. (or any affiliate thereof (individually and collectively, "<u>Scripps</u>"), including, without limitation, any right, title, claim or other interest pursuant to that certain Lease and Management

19

Services Agreement, dated as of June 11, 2010 between the Debtor and Scripps or otherwise, and (2) any other right, claim, title or other interest of Scripps relating to, arising out of or in connection with any obligation or agreement of the Debtor or any other person or party (including but not limited to in deposit accounts or any of the DIP Collateral), including without limitation, the Multi-Party Agreement, dated as of September 30, 2011, between the Debtor, Scripps, the Prepetition Agent and ORIX Proton San Diego, LLC;

ii.     pursuant to section 364(c)(2) of the Bankruptcy Code, a first-priority valid and perfected lien on and security interest in all unencumbered property of the Debtor or its estate, including without limitation, following entry of the Final Order, on proceeds of actions pursuant to sections 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code "Avoidance Action Proceeds"); and

iii.    pursuant to section 364(c)(3) of the Bankruptcy Code, a valid and perfected junior lien on and security interest in all property of the Debtor's estate wherever located (now or hereafter acquired and all proceeds, products and offspring thereof) that is subject to a Permitted Exception, which DIP Lien is junior only to any such Permitted Exception and senior to any and all other liens, interests and encumbrances.

The liens and security interests identified in this paragraph are referred to herein as the "DIP Liens." The DIP Liens shall be subject and subordinate to the Carve-Out. The DIP Liens shall not, without the consent of the Required DIP Lenders, be made subject to, *pari passu* with or

20

subordinate to, any other lien or security interest, other than to the extent expressly provided herein and subject to the Carve-Out, by any Court order heretofore or hereafter entered in the Chapter 11 Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (to the extent permitted by applicable law) or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Chapter 11 Case.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents or as approved by the Court.  The term "DIP Collateral," as used herein, shall mean (i) all of the property and assets of the Debtor or the estate (including, without limitation, the Prepetition Collateral) whether arising prepetition or postpetition of any nature whatsoever and all proceeds, products, offspring, profits or rents thereof and (ii) subject to the entry of the Final Order, the Avoidance Action Proceeds.

9.    <u>Automatic Effectiveness of Liens</u>.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtor to grant the liens and security interests to the DIP Secured Parties and the Prepetition Agent (for its benefit and for the benefit of the Prepetition Lenders) as contemplated by this Interim Order and the other DIP Loan Documents.

10.    <u>Automatic Perfection of DIP Liens and Adequate Protection Liens</u>.

i.    The DIP Liens and Adequate Protection Liens (as defined below) granted pursuant to this Interim Order shall constitute valid, enforceable, unavoidable and duly perfected security interests and liens (with the priority set forth herein), and the DIP Secured Parties and Prepetition

21

Agent, as applicable, shall <u>not</u> be required to file or serve financing statements, notices of lien, mortgages, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtor to execute any documentation relating to the DIP Liens or the Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or priority of such liens.  The DIP Secured Parties and Prepetition Agent are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Administrative Agent, the DIP Lenders or the Prepetition Agent shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim Order.  Upon the request of the DIP Administrative Agent or the Prepetition Agent, as applicable, the Debtor, without any further consent of any party, are authorized to and

22

shall take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Administrative Agent, DIP Lenders or Prepetition Agent, as the case may be, to further validate, perfect, preserve and enforce the DIP Liens and Adequate Protection Liens, as applicable, consistent with the terms of this Interim Order. All such documents shall be deemed to have been recorded and filed as of the Petition Date. A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

ii.    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest, or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured

23

Parties or the Prepetition Agent in accordance with the terms of the DIP

Loan Documents or this Interim Order.

11.    <u>Other Automatic Perfection Matters</u>.  To the extent that  the Prepetition Agent is

the secured party under any account control agreements, listed as loss payee under the Debtor's

insurance policies or is the secured party under any Prepetition Document, the DIP

Administrative Agent, on its behalf and on behalf of the DIP Lenders, is also deemed to be the

secured party under such account control agreements, loss payee under the Debtor's insurance

policies and the secured party under each such Prepetition Document, and shall have all rights

and powers in each case attendant to that position (including, without limitation, rights of

enforcement), and shall act in that capacity and distribute any proceeds recovered or received in

accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the

other DIP Loan Documents.   The Prepetition Agent shall serve as agent for the DIP

Administrative Agent for purposes of perfecting the DIP Administrative Agent's security

interests in and liens on all DIP Collateral that is Prepetition Collateral of a type such that

perfection of a security interest therein may be accomplished only by possession or control by a

secured party.

12.    <u>Protection of DIP Lenders' Rights</u>.  So long as there are any borrowings or other

amounts (other than contingent indemnity obligations as to which no claim has been asserted

when all other amounts have been paid and no letters of credit are outstanding) outstanding

under the DIP Loan Documents, or the DIP Lenders have any Commitment (as defined in the

DIP Loan Documents) outstanding, (a) no other creditor will take any action to foreclose upon or

recover or otherwise exercise remedies with respect to any DIP Collateral, except to the extent

authorized by an order of this Court, and (b) the Prepetition Agent and the Prepetition Lenders

24

shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, which DIP Collateral is subject to the Adequate Protection Liens.

13.    <u>Preservation of Rights Granted Under the Order</u>.  No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Administrative Agent, the DIP Lenders or the Prepetition Secured Parties shall be granted or allowed while any portion of the DIP Facility or the Commitment thereunder or the DIP Obligations remain outstanding, and the DIP Liens and the Adequate Protection Obligations (as defined below) shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

14.    <u>DIP Superpriority Claims</u>.  In addition to the liens and security interests granted to the DIP Administrative Agent on its behalf and on behalf of the DIP Secured Parties pursuant to this Interim Order, subject and subordinate to the Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses against the Debtor, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507, 546, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be

25

considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment of the Carve-Out to the extent specifically provided for herein.  The DIP Superpriority Claims shall be subject and subordinate in priority of payment only to, after the Carve-Out Effective Date (as defined below), the Carve-Out, and, subject to the DIP Term Sheet, the Accrual Amount (as defined in the DIP Term Sheet).  Except as expressly set forth herein, no other superpriority claims shall be granted or allowed in this Chapter 11 Case.

15.    <u>Adequate Protection for Prepetition Secured Parties</u>.  The Prepetition Agent (for its benefit and for the benefit of the Prepetition Lenders) shall be granted the following protection, pursuant to sections 361, 507 and 363(e) of the Bankruptcy Code, for and equal in amount to the diminution in the value of the Prepetition Agent's and Prepetition Lenders' interest in the Prepetition Collateral, arising from or relating to the priming of the Prepetition Liens, the sale, lease or use by the Debtor of the Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise (together, the "<u>Adequate Protection Obligations</u>"):

i.    <u>Adequate Protection Liens</u>.    The Prepetition Agents, on behalf of themselves and the Prepetition Lenders, shall be granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien on all assets and property of the Debtor whether arising prepetition or postpetition of any nature

26

whatsoever, including, without limitation, following entry of the Final Order, Avoidance Action Proceeds (the "<u>Adequate Protection Liens</u>"), which liens and security interests are junior and subordinate to (x) the Carve-Out, and (y) the DIP Obligations, the DIP Liens and the DIP Superpriority Claims.  The Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise except as expressly provided in this Interim Order and the DIP Loan Documents.

ii.  <u>507(b) Claim</u>.  To the extent the Prepetition Agent shall hold claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of adequate protection hereunder, the Prepetition Agent (for its benefit and the benefit of the Prepetition Lenders) is hereby granted an administrative expense claim pursuant to Bankruptcy Code section 507(b) (a "<u>Adequate Protection Section 507(b) Claim</u>") with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, the DIP Obligations, the DIP Liens and the DIP Superpriority Claims.

iii.  <u>Adequate Protection Payments</u>.  The payments under this paragraph shall be referred to collectively as the "<u>Adequate Protection Payments</u>."  The Debtor shall promptly pay, whether incurred prior to or following the

27

Petition Date, all fees and expenses of the Prepetition Agent and the Prepetition Lenders as provided for in the Prepetition Loan Documents, including the reasonable fees and expenses of (x) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the Prepetition Agent, (y) Richards, Layton & Finger, P.A., as local Delaware counsel to the Prepetition Agent, and (z) Loughlin Management Partners + Company, as financial advisor to the Prepetition Agent, and any other professionals retained by the Prepetition Agent for which such party is entitled to be reimbursed under the Prepetition Loan Documents.   In the event that any Adequate Protection Payment would be required to be repaid to the Debtor as a result of application of Bankruptcy Code section 506(b) or otherwise, any such amounts shall not be repaid and instead shall be applied as follows:  first, to the DIP Obligations until such obligations are indefeasibly paid in full, in cash; second, to the Prepetition Obligations until such obligations are indefeasibly paid in full, in cash; third to the Debtor and its estate, or subject to further order of this Court.  The Debtor's payment of the fees and expenses of the Prepetition Agent's attorneys and advisors shall be subject to the same procedures as those set forth in Paragraph 40 below.

iv.     Financial Reporting.  The Debtor shall continue to provide the Prepetition Agent and Prepetition Lenders with financial and other reporting in compliance with the Prepetition Documents and any reporting described herein.

28

#4818-4498-0029

Nothing herein shall prohibit, limit or restrict any Prepetition Secured Party from seeking any further or additional adequate protection at any time.

16. <u>No Investigation; Limitation on Use</u>.  No portion of the DIP Facility, the DIP Collateral (including the Cash Collateral), or the Carve-Out, and no disbursements set forth in the DIP Budget, shall be used (i) for the payment of professional fees, disbursements, costs or expenses incurred by any party in interest in connection with (a) investigating (except as provided below), asserting or prosecuting any claims or causes of action against, or bringing any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any of, the DIP Administrative Agent (in such capacity), the DIP Lenders (in such capacity), the Prepetition Agent (in such capacity), the Prepetition Lenders (in such capacity) or arising under or related to the DIP Loan Documents, the DIP Liens, the Prepetition Loan Documents, or the Prepetition Liens, (b) raising any defenses to the DIP Loan Documents, the claims or liens of the DIP Secured Parties (including, without limitation, the DIP Obligations and the DIP Liens), the Prepetition Loan Documents, or the claims or liens of the Prepetition Secured Parties (including, without limitation, the Prepetition Obligations and the Prepetition Liens), or (c) bringing any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type challenging the extent, priority, or validity of Varian Medical System, Inc.'s ("<u>Varian</u>") claims against the Debtor or seeking any affirmative relief vis-à-vis Varian, (ii) for any purpose that is prohibited by the Bankruptcy Code or this Interim Order; provided, however, that the foregoing limitations shall not encompass any investigation (but not any drafting, filing, or prosecution) of the Prepetition Obligations and the Prepetition Liens (but not the claims and/or liens of the DIP Secured Parties) conducted by the professionals retained by any Committee, so long as the costs,

29

fees, and expenses incurred by such professionals do not exceed $25,000 in the aggregate, and so long as such investigation occurs within the Challenge Deadline (as defined herein), (iii) for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (other than payment of the Rollup Amount and permitted adequate protection payments as set forth herein), (iv) to make any payment or distribution under a plan of reorganization in the Chapter 11 Case, (v) to make any payment in settlement of any claim, action or proceedings, before any court, arbitrator or other governmental body without the prior written consent of the Required DIP Lenders, or (vi) for any purpose or in any manner not approved in the DIP Budget or by the Required DIP Lenders.

17.    _Restrictions on Granting Postpetition Liens; Collateral Rights; Limitations in Respect of Subsequent Court Orders and Subordination of Liens_.    Except for the Carve-Out or as otherwise expressly set forth in the DIP Loan Documents or this Interim Order, it shall constitute an immediate Event of Default (without notice or any opportunity to cure) under the DIP Facility if the Debtor (a) incurs or requests authority to incur any additional postpetition indebtedness (other than ordinary course trade debt subject to the limitations set forth in the Prepetition Loan Documents) or (b) grants or requests authority to grant any lien or security interest to secure such postpetition indebtedness.    Without limiting any other provisions and protections of this Interim Order, unless the DIP Administrative Agent has provided its prior written consent, there shall not be entered in these proceedings, or in any successor case, any order which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status.    Without limiting the provisions and protections of this paragraph, if at any time prior to the indefeasible repayment and satisfaction in full in

30

cash of all DIP Obligations and the termination of the DIP Lenders' obligations to make DIP Loans under the DIP Facility, including subsequent to the confirmation of any plan of reorganization with respect to the Debtor or its estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall be immediately turned over to the DIP Administrative Agent for application in accordance with this Interim Order and the DIP Loan Documents.

18.    <u>Binding Nature of Order</u>.  The provisions of this Interim Order shall be binding upon the Debtor and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of the Debtor's estate or with respect to its property).

19.    <u>Carve-Out</u>.  Upon the DIP Administrative Agent's issuance of a Carve-Out Notice (as defined below), all liens, claims and other security interests held by any party, including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Prepetition Liens, shall be subject to the payment of the Carve-Out.  For purposes of this Order, "<u>Carve-Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid reasonable fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by (a) the

31

Debtor pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (b) any Committee (if one is appointed) ((a) and (b) together, the "Estate Professionals") and in each case incurred at any time on or before the first business day following delivery by the DIP Administrative Agent of a Carve-Out Notice (the "Carve-Out Effective Date"), whether allowed by the Court prior to or after delivery of a Carve-Out Notice, in an aggregate amount for all Estate Professionals not to exceed the aggregate line-item amounts set forth for all Estate Professionals for the applicable period prior to the Carve-Out Effective Date in the DIP Budget (subject to reduction as set forth below); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $250,000 incurred after the Carve-Out Effective Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Notice Cap").  For purposes of the foregoing, "Carve-Out Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtor, their lead restructuring counsel, the U.S. Trustee and lead restructuring counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Facility, expressly stating that it is a Carve-Out Notice. Notwithstanding the foregoing, so long as a Carve-Out Notice has not been issued, the Debtor shall be permitted to pay reasonable fees to Estate Professionals and reimburse reasonable expenses incurred by Estate Professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court as the same may be due and payable and the same shall not reduce the Post Carve-Out Notice Cap; provided that any amounts so paid shall reduce the Carve-Out amount set forth in clause (iii) on a dollar-for-dollar basis; provided further, that nothing herein shall be construed to

32

impair the ability of any entity to object to the fees, expenses, reimbursement or compensation described above.

20.    <u>Survival of Order</u>.    The provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive, and shall not be modified, impaired or discharged by the entry of any order:  (i) confirming any plan of reorganization in the Chapter 11 Case; (ii) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Case; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Loan Documents. Notwithstanding the entry of any order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise, (x) the DIP Liens and DIP Superpriority Claims granted to the DIP Secured Parties pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in cash in full (and that such DIP Liens and DIP Superpriority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (x) above.

21.    <u>Protection under Section 364(e) of the Bankruptcy Code</u>.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations owing to the DIP Secured Parties, as applicable, incurred prior to the

33

actual receipt by such entities of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations owing to the DIP Secured Parties or the Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtor to the DIP Administrative Agent, the DIP Lenders or the Prepetition Agent prior to the actual receipt of written notice by the DIP Administrative Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Administrative Agent, the DIP Lenders, and the Prepetition Agent (for its benefit and for the benefit of the Prepetition Lenders) shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

22.    <u>Termination of DIP Facility</u>.  The Debtor's right to use the DIP Facility shall terminate immediately, and the Debtor shall be obligated to repay in cash all outstanding DIP Obligations, upon the earliest to occur of (the "<u>Maturity Date</u>"): (i) three (3) months following the Closing Date (the "<u>Initial Maturity Date</u>"), provided that the Initial Maturity Date shall automatically extend for an additional three (3) month period (the "<u>Initial Extension</u>") and extend again from the date of the Initial Extension to October 31, 2017 (the "<u>Final Extension</u>"), provided that (a) no Default or Event of Default has occurred and is continuing, unless the DIP Administrative Agent at the direction of the Required DIP Lenders delivers a notice two (2) weeks prior to the Maturity Date that such Extension shall not be granted; (ii) the earlier of the

#4818-4498-0029

effective date and the date of substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of any chapter 11 plan for the Debtor filed in the Chapter 11 Case and confirmed pursuant to an order entered by the Bankruptcy Court; (iii) the date that the Court orders (x) the conversion of the Debtor's bankruptcy case to chapter 7 or (y) a dismissal of the Debtor's bankruptcy case; (iv) the date of consummation of a sale of all or substantially all of the Debtor's assets or stock pursuant to section 363 of the Bankruptcy Code; (v) the acceleration of the DIP Loans and the termination of the Commitment by the DIP Lenders pursuant to the terms of the DIP Loan Documents, including as a result of the occurrence of an Event of Default; and (vi) the thirtieth (30th) day after the entry of this Interim Order (unless such date is extended by the Required DIP Lenders), if, as of such date, the Bankruptcy Court shall not have entered the Final Order.

23.    <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" under the DIP Term Sheet and this Interim Order:

i.    The Debtor shall fail to pay (i) any principal of the DIP Loans when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment; or (ii) within three (3) business days, any interest on the DIP Loans, the fees or other sums due thereunder, when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment;

ii.    The Debtor's  failure to perform, in any respect, any of the terms, conditions or covenants or its obligations under the DIP Loan Documents

35

or this Interim Order and such failure remains uncured for three (3) business days;

iii.   The Debtor fails to satisfy any of the 363 Sale Milestones as set forth in the DIP Term Sheet;

iv.   The Chapter 11 Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

v.   A chapter 11 trustee, receiver, or examiner with enlarged powers shall be appointed in the Chapter 11 Case;

vi.   Except as expressly set forth in this Interim Order, the Final Order, the DIP Term Sheet or the other DIP Loan Documents, the Debtor (1) incurs or requests authority to incur any additional postpetition indebtedness (other than ordinary course trade debt, subject to the limitations set forth in the Prepetition Loan Documents) or (2) grants or requests authority to grant any lien or security interest to secure such postpetition indebtedness;

vii.   This Interim Order or the Final Order, as the case may be, shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Debtor shall apply for authority to do so) without the written consent of the Required DIP Lenders or this Interim Order or the Final Order shall cease to be in full force and effect;

viii.   The Final Order shall not have been entered within thirty (30) days following entry of this Interim Order (unless such date is extended by the Required DIP Lenders);

#4818-4498-0029

ix.    A Debtor Party (as defined in the DIP Term Sheet) shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition claim other than (x) as provided for in a First Day Order and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a material adverse effect on the Debtor or its estate, or (iii) approving any settlement or other stipulation not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of the Debtor providing for payments as adequate protection or otherwise to such secured creditor;

x.    Any material contract is rejected or otherwise terminated or any material property of the Debtor is sold, in each instance, without the prior written consent of the Required DIP Lenders; or

xi.    Any other Event of Default as set forth in the DIP Term Sheet or the DIP Loan Documents.

24.    <u>Modification of Stay; Rights and Remedies upon Termination</u>.    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured Parties to exercise (a) immediately upon the occurrence of an Event of Default (without further notice of grace period, unless required by applicable law), all rights and remedies as provided under the DIP Loan Documents other than those rights and

37

remedies against the DIP Collateral as provided in clause (b) below, and (b) upon the occurrence and during the continuance of an Event of Default and the giving of seven 7 business days' prior written notice to the Debtor, the Prepetition Agent, the Committee (if one is appointed), and the U.S. Trustee to the extent provided for in any DIP Loan Document, all rights and remedies against the DIP Collateral provided for in any DIP Loan Document.  In any hearing regarding any exercise of rights or remedies under the DIP Loan Documents, the only issue that may be raised by the Debtor in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor hereby waives its right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of either the DIP Administrative Agent or the DIP Lenders set forth in this Interim Order or the DIP Loan Documents.  In no event shall the DIP Administrative Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The delay or failure to exercise rights and remedies under the DIP Loan Documents or this Interim Order by any of the DIP Administrative Agent or DIP Lenders shall not constitute a waiver of such DIP Administrative Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Loan Documents.  Notwithstanding the foregoing, irrespective of the occurrence and continuation of an Event of Default and the provisions set forth above, the DIP Lenders and DIP Administrative Agent shall not sweep any funds of the Debtor, the sweeping of which would reasonably be expected to adversely affect patient care; provided that this limitation shall not apply if Scripps fails to perform in any respect under the Facility Lease or the Debtor is no longer treating or scheduled to treat patients.

#4818-4498-0029

25. <u>Indemnification</u>. The indemnification provisions set forth in the DIP Term Sheet (including in the section titled "Indemnification by the Debtor") are hereby approved; provided that nothing herein or in the DIP Loan Documents shall affect any indemnification rights or obligations in respect of the Prepetition Secured Parties under the Prepetition Facility, which indemnification obligations shall survive the Closing Date and the repayment of the DIP Loans and exercise of any remedies in connection therewith and shall continue as indemnification obligations hereunder following the Closing Date or the exercise of any such remedies subject to the terms of this Interim Order or the DIP Loan Documents.

26. <u>Modifications of DIP Loan Documents and DIP Budgets</u>. The Debtor is hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties, as applicable, providing for any non-material modifications to the DIP Loan Documents, or of any other modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan Documents to this Interim Order; <u>provided</u>, <u>however</u>, that the Debtor shall not enter into any material modification or amendment to the DIP Loan Documents that is adverse to the Debtor's estate absent further order of this Court.

27. <u>DIP Administrative Agent, Prepetition Agents Authorization</u>. For the avoidance of doubt and notwithstanding any provision of the Prepetition Documents or the DIP Loan Documents, each of the DIP Administrative Agent and the Prepetition Agent is hereby authorized to make any and all account transfers requested by the Debtor in accordance with the DIP Budget, and is further authorized to take any other action reasonably necessary to implement the terms of this Interim Order.

28. <u>No Modification of Interim Order</u>. The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written

#4818-4498-0029

consent of the DIP Administrative Agent, and no such consent shall be implied by any action, inaction or acquiescence of the DIP Administrative Agent.

29.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the DIP Administrative Agent's, the DIP Lenders' or the Prepetition Agent's right to seek any other or supplemental relief in respect of the Debtor or (b) any of the rights of the DIP Administrative Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders under the Bankruptcy Code or applicable nonbankruptcy law.

30.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the Motion, any other order of this Court (other than the Final Order), the DIP Term Sheet, the DIP Loan Documents, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern.

31.     <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11 Case.

32.     <u>Limitation of Liability</u>.  In determining to make any DIP Loans under the DIP Facility, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), or the DIP Loan Documents, as applicable, upon entry of the Final Order, none of the DIP Administrative Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtor or any affiliate (as defined in

40

section 101(2) of the Bankruptcy Code) of the Debtor, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor or any affiliate of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Furthermore, upon entry of the Final Order, nothing herein or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Administrative Agent or the DIP Lender, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtor or any affiliate of the Debtor.

33. <u>Credit Bidding</u>. Subject to section 363(k) of the Bankruptcy Code, (i) the DIP Administrative Agent shall have the right, upon the direction of the Required DIP Lenders, to credit bid up to the full amount of the DIP Obligations with respect to any bulk or piecemeal sale of all or any portion of the DIP Collateral, and (ii) subject to the indefeasible payment in full in cash of the DIP Obligations, the Prepetition Agent shall have the exclusive right to use the Prepetition Obligations and the Adequate Protection Liens and Adequate Protection Section 507(b) Claims to credit bid (in accordance with the Prepetition Loan Documents) with respect to any bulk or piecemeal sale of all or any portion of the Prepetition Collateral, in each case, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

34. <u>506(c) Waiver</u>. Subject to the entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Case or any successor case, including any chapter 7 case, that may result therefrom, including liquidation in bankruptcy or

41

other proceedings under the Bankruptcy Code, shall be charged against or recovered from (i) the DIP Administrative Agent or any DIP Lender, any of the DIP Obligations, any Prepetition Secured Party, or any of the Prepetition Obligations, (ii) any of the DIP Lenders', DIP Administrative Agent's or the Prepetition Secured Parties' respective claims, or (iii) the DIP Collateral or Prepetition Collateral, as applicable, pursuant to Bankruptcy Code sections 105(a) or 506(c), or otherwise, without the prior written consent of the affected DIP Administrative Agent, DIP Lender or Prepetition Secured Party, as applicable, each in its/their sole discretion, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the DIP Lenders, the DIP Administrative Agent, or the Prepetition Secured Parties, as applicable, or their respective representatives.

35.    Effect of Stipulations on Third Parties.

(a)    Generally. The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph E above of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtor, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, any Committee, unless, and solely to the extent that, a party-in-interest with standing and requisite authority, (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in Paragraph 16 of this Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (x) with respect to the Committee

42

(if appointed) sixty (60) calendar days from the formation of the Committee and (y) with respect to other parties-in-interest with requisite standing, seventy-five (75) calendar days from the Petition Date (such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph 35, the "Challenge Deadline"), as such date may be extended in writing from time to time in the sole discretion of the Prepetition Agent or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     Binding Effect. To the extent any Prepetition Lien and Claim Matter is not subject to a Challenge timely and properly commenced by the Challenge Deadline, or to the extent any Challenge does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall pursuant to this Interim Order become binding, conclusive and final on any person, entity or party-in-interest in the Chapter 11 Case, and their successors and assigns, and in any successor case for all purposes and shall not be subject to challenge or objection by any party-in-interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers or other representative of the Debtor's estate. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding unless such Challenge is successful pursuant to an order or judgment that is final and no longer subject to appeal or further review.  To the extent any such Challenge

43

#4818-4498-0029

proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to include the related costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending themselves in any such proceeding pursuant to the Prepetition Financing Documents.

36.     <u>Section 552(b)</u>.  Subject to the entry of the Final Order, each of the DIP Lenders, the DIP Administrative Agent, and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b).  The "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the DIP Lenders, the DIP Administrative Agent and Prepetition Secured Parties with respect to (i) proceeds, products or profits of any of the Prepetition Collateral, including Cash Collateral, or DIP Collateral, as applicable or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.

37.     <u>No Marshaling</u>.  None of the DIP Administrative Agent, DIP Lenders, DIP Collateral, Prepetition Secured Parties or Prepetition Collateral shall be subject to the doctrine of marshaling or any similar doctrine or law of any jurisdiction requiring the recovery upon or application to any indebtedness of any collateral or proceeds in any particular order or action.

38.     <u>Master Proof of Claim</u>.  The Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, will not be required to file proofs of claim in the Chapter 11 Case or any successor case for any claim. Notwithstanding any order to the contrary entered by the Court in relation to the establishment of a bar date in the Chapter 11 Case or any successor case, the Prepetition Agent on behalf of itself and the Prepetition Secured Parties shall be authorized (but not required) in its sole discretion to file a master proof of claim against the Debtor (a "<u>Master Proof of Claim</u>") on account of their prepetition claims arising under the Prepetition Loan

44

Documents. Upon the filing of a Master Proof of Claim against the Debtor, the applicable
Prepetition Secured Party and each of its respective successors and assigns, shall be deemed to
have filed a proof of claim in the amount set forth opposite its name therein in respect of its
claims against the Debtor arising under the Prepetition Loan Documents, and the claims of the
Prepetition Secured Party (and its respective successors and assigns) named in the Master Proof
of Claim shall be allowed or disallowed as if such entity had filed a separate proof of claim in the
Chapter 11 Case or any successor case in the amount set forth opposite each name listed in the
Master Proof of Claim.   The Prepetition Agent shall further be authorized to amend its Master
Proof of Claim from time to time to, among other things, reflect a change in the holders of the
claims set forth therein or a reallocation among such holders of the claims asserted therein
resulting from any transfer of such claims. The provisions set forth in this paragraph and any
Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of
administrative convenience and shall not affect the substantive rights of any party in interest or
their respective successors in interest, including, without limitation, the rights of each Prepetition
Secured Party as the holder of a claim against the Debtor under applicable law, and the
numerosity requirements set forth in section 1126 of the Bankruptcy Code.

39.   No Third Party Rights.   Except as explicitly provided for herein, this Interim
Order does not create any rights for the benefit of any party, creditor, equity holder or other
entity other than the DIP Administrative Agent, the DIP Lenders, the Prepetition Agent (for its
benefit and for the benefit of the Prepetition Lenders), and the Debtor, and their respective
successors and assigns.

40.   DIP Fees and Expenses.   The Debtor is authorized and directed to pay all fees and
expenses of the DIP Secured Parties in connection with the DIP Facility, as provided in the DIP

45

#4818-4498-0029

Loan Documents, whether or not the transactions contemplated hereby are consummated, and whether incurred on, prior to, or following the Petition Date, including, without limitation, agency fees, the professional fees and expenses of Milbank, Tweed, Hadley & McCloy LLP and Richards, Layton & Finger, P.A. (as counsel to the DIP Administrative Agent) and Loughlin Management Partners + Company (as financial advisor to the DIP Administrative Agent ) (the "DIP Secured Parties' Fees and Expenses").  Promptly following entry of this Interim Order, the Debtor shall pay all DIP Secured Parties' Fees and Expenses invoiced and outstanding as of the date of entry of this Interim Order.  Thereafter, the Debtor shall pay the DIP Secured Parties' Fees and Expenses from time to time within fifteen (15) days (if no written objection is received within ten (10) days) after such professional has delivered an invoice providing reasonable detail (which may be in summary format) with respect to the fees and expenses incurred to the Debtor (which invoice may be redacted to protect privileged, confidential or proprietary information), with a copy of such invoice delivered simultaneously to the office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and lead restructuring counsel to the Committee (if one is appointed).  Written objections to the payment of the DIP Secured Parties' Fees and Expenses must contain a specific basis for the objection and quantification of the undisputed amount of the DIP Secured Parties' Fees and Expenses invoiced.  None of the DIP Secured Parties' Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided however, that the Debtor shall be required to pay (i) the undisputed amount of any invoice on or prior to the fifteenth (15th) business day following delivery of such invoice, notwithstanding any

46

objection to other amounts on such invoice, and (ii) any disputed amounts within five (5) business days following resolution of the dispute with respect to such amounts.

    41.   <u>Adequate Protection for Varian</u>.  Varian shall be granted the following protection, pursuant to sections 361, 507 and 363(e) of the Bankruptcy Code, for and equal in amount to the diminution in the value of Varian's interest in the Proton Equipment Collateral, arising from or relating to the priming of the Varian Prepetition Liens, the sale, lease or use by the Debtor of the Proton Equipment Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise (together, the "<u>Varian Adequate Protection Obligations</u>"):

    i.   <u>Varian Adequate Protection Liens</u>.  Varian shall be granted for its benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a replacement security interest in and lien on the Proton Equipment Collateral (the "<u>Varian Adequate Protection Liens</u>", which liens and security interests are junior and subordinate to the Carve-Out, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Obligations, the Adequate Protection Liens, the Adequate Protection Section 507(b) Claim and the Adequate Protection Payments.  The Varian Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy

47

#4818-4498-0029

Code or otherwise except as expressly provided in this Interim Order and the DIP Loan Documents.

ii.    <u>Varian 507(b) Claim</u>.  To the extent Varian shall hold claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of adequate protection hereunder, Varian is hereby granted an administrative expense claim pursuant to Bankruptcy Code section 507(b) (the <u>Varian Section 507(b) Claim</u>") with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Obligations, the Adequate Protection Liens, the Adequate Protection Section 507(b) Claim and the Adequate Protection Payments.

iii.    <u>Payments to Varian</u>.  As additional protection to Varian, (i) any amounts paid to Varian prior to the Petition Date under that certain Secondment Agreement dated as of November 6, 2015, by and between the Debtor and Varian (as amended or modified from time to time, the "<u>Secondment Agreement</u>"), shall not be subject to avoidance pursuant to chapter 5 of the Bankruptcy Code or otherwise and (ii) to the extent any amounts under the Secondment Agreement remain due and owing to Varian as of the Petition Date, such amounts shall be paid by the Debtor promptly from the proceeds of the DIP Facility in accordance with the DIP Budget.

42.    <u>Final Hearing</u>.  The Final Hearing is scheduled for _____ ____, _____, at __:00_.m. (prevailing Eastern Time) before this Court.  The Debtor shall promptly serve notice

48

of entry of this Interim Order and the Final Hearing on the appropriate parties in interest in accordance with the Bankruptcy Rules and the Local Rules.  Without limiting the foregoing, the Debtor shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the District of Delaware and served so as to be actually received by no later than 5:00 p.m. (prevailing Eastern Time) on _____ __, _____ by the following: (i) counsel to the Debtor, Locke Lord LLP, 111 S. Wacker Drive, Chicago, Illinois 60091, Attn: David W. Wirt and Aaron C. Smith, and Polisnelli, PNC Bank, 222 Delaware Ave. #1101, Attn: Christopher A. Ward; and (ii) counsel to the DIP Administrative Agent, Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, 33rd Floor, Los Angeles, California 90067, Attn: Gregory A. Bray, Esq. and Haig M. Maghakian, Esq., and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, Esq.

43.   Enforceability.   This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

44.   Retention of Jurisdiction.   Notwithstanding any provision in the DIP Loan Documents or the Prepetition Loan Documents, this Court shall retain jurisdiction over all

49

matters pertaining to the implementation, interpretation and enforcement of this Interim Order,

the DIP Facility, or the DIP Loan Documents.

Dated: _____          _____
        Wilmington, Delaware                          United States Bankruptcy Judge

50

**EXHIBIT A**

**DIP Term Sheet**

**CALIFORNIA PROTON TREATMENT CENTER, LLC**

**TERMS FOR DEBTOR-IN-POSSESSION FINANCING**

The Parties hereby agree to the following terms of a debtor-in-possession financing ("DIP Facility") to be used to fund working capital during the pendency of the Chapter 11 Case ("Chapter 11 Case").

The terms and conditions for the extension of credit described herein are dependent upon, among other things, (i) authorization and approval by the Bankruptcy Court (as defined below) and (ii) internal authorization and approval by the appropriate credit committee or other parties of the DIP Lenders. The terms and conditions with respect to such commitments are mutually dependent on each other, and the DIP Lenders shall not be obligated to extend credit unless agreement with the Debtor (as defined below) and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole and without modification, unless otherwise agreed by the Debtor and DIP Lenders in writing.

| **Parties** | **Debtor**: California Proton Treatment Center, LLC (the "Debtor" or the "Company"), as debtor-in-possession in the case pending under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the State of Delaware (the "Bankruptcy Court"). The date the Chapter 11 Case is commenced, which is expected to occur on or about February 28, 2017 is referred to herein as the "Petition Date." The Debtor hereby agrees to the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay) all obligations and all fees, indemnification payments, premium and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing or existing to the DIP Lenders or the DIP Administrative Agent under this DIP Facility and the other documents executed in connection with the DIP Facility, if any (the "DIP Loan Documents"), including all interest, fees, premium and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Borrower, whether or not such interest, fees, premium or expenses are enforceable or allowed as a claim in such proceeding (such obligations being herein collectively called the "DIP Obligations"). |
| --- | --- |
| | **DIP Lenders**: The lenders under the DIP Facility (the "DIP Lenders") shall be the entities listed on Annex I and/or its respective affiliates or designees and each such DIP Lender's Commitment (as defined below) as set forth on Annex I; provided that no affiliate of the Company shall become a DIP Lender. |
| | **DIP Administrative Agent**: ORIX Capital Markets, LLC (the "DIP Administrative Agent" and together with the DIP Lenders, the "DIP Secured Parties") is the administrative agent for the DIP Lenders under the DIP Facility. |
| | "Prepetition Guarantors" means each of Jeffrey L. Bordok and James Thomson. |
| | "Debtor Parties" means, collectively, the Debtor, the Prepetition Guarantors, and each corporation, partnership, limited partnership, limited liability company or other legal entity whose consent or authorization is required for Debtor to enter into, and perform its obligations under, this DIP Facility or the Prepetition Facility. |

| | |
|---|---|
| **Existing Debt Arrangements/ Prepetition Facility** | **Prepetition Facility:**  The Company is a party to that certain Loan and Security Agreement, dated as of September 30, 2011, among the Company, as Borrower, the DIP Administrative Agent, in its capacity as agent on behalf of the Prepetition Lenders (the "Prepetition Agent"), and the lenders party thereto from time to time (the "Prepetition Lenders") (as amended by the Forbearance Agreement and Consent to Secondment dated as of November 6, 2015 and as further amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Facility").    The Prepetition Facility and all instruments and documents executed at any time in connection therewith, shall be referred collectively as the "Prepetition Loan Documents."<br><br>"Prepetition Required Lenders" shall have the same meaning as "Required Lenders" in the Prepetition Facility. |
| **DIP Facility/ Use of Proceeds** | **DIP Facility:**  The DIP Facility shall be comprised of superpriority priming delayed multiple-draw term loans (the "DIP Loans" and the commitment of the DIP Lenders to make the DIP Loans, the "Commitment"), consisting of (i) a new money loan in an aggregate amount of up to $16,000,000 ("New Money Loans"), (ii) the Roll-Up (as defined below) and (iii) the Upfront Fee (payable to each DIP Lender according to its pro rata share of the New Money Loans which fee shall be fully earned on the Closing Date and shall be ratably added to the then outstanding DIP Loans on such date and shall constitute principal thereof for all purposes hereof).  Amounts paid or prepaid under the DIP Loans may not be reborrowed.<br><br>**DIP Loans:**  Subject to the terms and conditions herein, the proceeds of DIP Facility (including the Interim Facility (as defined below)) shall be used in accordance with the terms of the Budget (as defined below), including, without limitation: (i) to repay on the Final Order Entry Date (as defined below) first the Tranche C Notes (as defined in the Prepetition Facility) and second a pro rata portion of the aggregate outstanding principal of Tranche A Notes (as defined in the Prepetition Facility) in an amount equal to $16,000,000 (the "Roll-Up"); (ii) to pay (a) all reasonable fees due to DIP Secured Parties, (b) all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by DIP Secured Parties, including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility, and (c) adequate protection payments to the Prepetition Secured Parties as set forth herein; and (iii) to provide working capital, and for other general corporate purposes of the Company, and to pay administration costs of the Chapter 11 Case and claims or amounts approved by the Bankruptcy Court.<br><br>**Use of Proceeds**: No portion of the Company's cash collateral and other cash (collectively, the "Cash Collateral"), the DIP Facility, the Collateral (as defined below) or the "Carve-Out" (as defined below) may be used:<br><br>(a)    for any purpose that is prohibited under the Bankruptcy Code or the Chapter 11 Order;<br><br>(b)    to finance in any way: (i) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of the DIP |

<table>
<tr><td></td><td></td><td>

Administrative Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders or their respective rights and remedies under DIP Loan Documents, the Interim Order, the Final Order or the Prepetition Loan Documents (ii) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type challenging the extent, priority, or validity of Varian Medical System, Inc.'s ("Varian") claims against the Debtor or seeking any affirmative relief vis-à-vis Varian, or (iii) any other action which with the giving of notice or passing of time would result in an Event of Default under the DIP Loan Documents;

</td></tr>
</table>

| | | Administrative Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders or their respective rights and remedies under DIP Loan Documents, the Interim Order, the Final Order or the Prepetition Loan Documents (ii) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type challenging the extent, priority, or validity of Varian Medical System, Inc.'s ("Varian") claims against the Debtor or seeking any affirmative relief vis-à-vis Varian, or (iii) any other action which with the giving of notice or passing of time would result in an Event of Default under the DIP Loan Documents; |
|---|---|---|
| | (c) | for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (other than the Roll-Up and permitted adequate protection payments); |
| | (d) | to make any distribution under a plan of reorganization in the Chapter 11 Case; |
| | (e) | to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Required DIP Lenders; and/or |
| | (f) | for any purpose or in any manner not approved in the Budget or by the Required DIP Lenders. |
| **Availability** | | **Interim Facility:** During the period commencing on the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order ("Interim Order") approving the DIP Facility or the terms hereof without modification, but prior to the entry of a final order ("Final Order" and the Interim Order as applicable, the "Chapter 11 Order") approving the DIP Facility or the terms hereof without modification or such earlier date upon the occurrence of a maturity event (such period, the "Interim Period"), the maximum amount available to be drawn under the DIP Facility shall be limited to $2,380,000 plus the Upfront Fee (the "Interim Facility"), subject to compliance with the terms, conditions and covenants herein and in accordance with the Budget. All DIP Loans made under the Interim Facility shall be due and payable on the date that is 30 days after the entry of the Interim Order (unless such date is extended by the Required DIP Lenders) or such earlier date upon the occurrence of a maturity event (the "Interim Facility Maturity Date"), unless a Final Order approving the DIP Facility in form and substance satisfactory to the Required DIP Lenders shall have been entered by the Bankruptcy Court on or before such date.<br><br>**Full Availability**. Upon the Bankruptcy Court's entry of the Final Order (the "Final Order Entry Date"), the amount used for the Roll-Up, and the full remaining amount of the Commitments shall be available to the Debtor in incremental amounts for the periods between the Closing Date to the Initial Maturity Date, the Initial Maturity Date to the Initial Extension and the Initial Extension to the Final Extension, subject to compliance with the terms, conditions and covenants described herein, including without limitation the Budget, and the delivery of a borrowing notice (the "Full Availability"). |
| | | |

| Budget | **Budget**: "Budget" means (i) the initial budget projecting operations for the ensuing eight month period including cash flow forecast of receipts and disbursements ("Initial Budget"); and (ii) each monthly cash flow forecast of receipts and disbursements update (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements) submitted no less frequently than each calendar month commencing on April 1, 2017 by the Company.  The Initial Budget is attached hereto as Annex IV.  Each subsequent Budget must be satisfactory to the DIP Lenders; provided, however, if a line item is not approved by the DIP Lenders it shall be deemed to be as set forth in the most recent Budget satisfactory to the DIP Lenders and any line item approved for a specific Budget Test Period and that the Company has diligently pursued the use thereof, but due to the collection policies of a third party is not fully utilized in such Budget Test Period may be used in the succeeding Budget Test Period to pay such third party.

"Budget Test Period" means each calendar month commencing on Wednesday, March 1, 2017.

Budget Tests:  The Borrower will not permit:

(a) the actual aggregate amount of Revenues (as defined in the Prepetition Facility) collected in the first Budget Test Period beginning on March 1, 2017 to be less than $1,345,000.  For all subsequent Budget Test Periods, the Borrower will not permit the actual aggregate amount of Revenues collected to be less than 90% of the budgeted amount for such Budget Test Period set forth in the Budget and each previous Budget Test Period set forth in the Budget ("Revenue Permitted Deviation"), and

(b) the actual aggregate amount of disbursements of line items set forth in the Budget to be more than 110% of the aggregate budgeted amount for such Budget Test Period set forth in the Budget and each previous Budget Test Period set forth in the Budget ("Disbursements Permitted Deviation") (it being understood and agreed that disbursements includes any and all operating and other costs and expenses other than the fees and expenses of the DIP Secured Parties that are required to be reimbursed shall not be included as "disbursements" and will not subject to any limitations on account of Disbursements Permitted Deviations (for the avoidance of doubt, fees and expenses paid to Varian under the Maintenance Agreement shall be included in the Budget as "disbursements")).

Compliance with the approved Budget shall be tested for the first month and each subsequent month on a cumulative basis beginning on March 1, 2017. |
| **Priority and Liens/Ranking / Security/ Collateral** | **Collateral**.

To secure payment of the DIP Obligations, the Company hereby grants to the DIP Administrative Agent, for the benefit of the DIP Lenders, a senior first priority security interest in and to: (a) the Collateral, (b) all real property and all improvements thereon, (c) all funds of Debtor on deposit from time to time, including, without limitation, all Deposits (as such term is defined under the Prepetition Facility) and (d) all Personal Property and all replacements, substitutions and additions to such property described in this paragraph and all proceeds thereof. |

"Collateral" means the Property and all other assets of the Company, whether now owned or hereafter acquired, and all proceeds thereof. For avoidance of doubt "Collateral" includes all of the collateral in which the Prepetition Agent or Prepetition Lenders have liens or security interests.

"Personal Property" means all of Company's personal property, fixtures, attachments and equipment on or hereafter located upon, attached to, and/or used or required to be used in connection with the operation of the Property, including, without limitation, the following types of property, as defined in Article 9 of the Uniform Commercial Code: Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Electronic Chattel Paper, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter of Credit Rights, and Supporting Obligations.

"Property" means collectively, the Land, the Improvements, including any Improvements that are constructed after the Closing Date, all Personal Property, all Leases and appurtenances relating to any of the foregoing (each as defined in the Prepetition Credit Agreement).

**Priority**. All DIP Obligations of the Debtor to the DIP Lenders and the DIP Administrative Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject to the Carve-Out, at all times:

(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Case, which claim in respect of the DIP Facility shall be superior to all other claims;

(b) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Debtor (now or hereafter acquired and all proceeds thereof);

(c) subject to the succeeding paragraph, pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all assets of the Debtor (now or hereafter acquired and all proceeds thereof) that are encumbered by Permitted Exceptions; and

(d) pursuant to Bankruptcy Code section 364(d), have a first priority priming lien on all assets of the Debtor (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date.

It is understood and agreed that all liens granted and/or described in this DIP Facility Agreement shall prime and be senior to (i) the liens securing the Prepetition Facility and other secured obligations including foreign exchange, currency and interest rate hedged obligations, (the "Existing Primed Secured Facility"), (ii) any alleged leasehold or other right, claim, title or interest (A) in any property of the Debtor pursuant to the Ground Lease (as defined in the Prepetition Facility) or the Ground Sublease (as defined in the Prepetition Facility) or (B) of Scripps Medical Group, Inc.[1] (or any affiliate thereof (individually and collectively, "Scripps"), including, without limitation any right title, claim or other interest pursuant to that certain Lease

---

[1] Nothing herein is an admission by any party with respect to the nature, priority, scope or existence of any rights, title or interest by Scripps in the Debtor's property now owned or hereafter acquired.

|  |  |
|---|---|
|  | and Management Services Agreement, dated as of June 11, 2010 between the Debtor and Scripps or otherwise, and (iii) and any other right, claim, title or other interest of Scripps relating to, arising out of or in connection with any obligation or agreement of the Company or any other person or party (including but not limited to in deposit accounts or any of the Collateral), including without limitation, the Multi-Party Agreement, dated as of September 30, 2011, between the Debtor, Scripps, the Prepetition Agent and ORIX Proton San Diego, LLC;  provided that the liens so created as described in clauses (b), (c), and (d) above shall be subject to certain Permitted Exceptions, except those securing the Existing Primed Secured Facility, as of the Petition Date.<br><br>"Permitted Exceptions" means those matters set forth on Annex II hereto.<br><br>The liens to be granted by the Bankruptcy Court shall cover all of the Collateral, including property or assets that do not secure the Existing Primed Secured Facility, except until entry of the Final Order, proceeds on claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code (the "Avoidance Actions"), and as otherwise agreed to by the Required DIP Lenders in their sole discretion.<br><br>"Carve-Out" shall have the meaning set forth in the Chapter 11 Order.<br><br>All of the liens described herein with respect to the assets of the Debtor shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.  Notwithstanding the foregoing, the DIP Administrative Agent may take whatever action, and the Debtor shall authorize and execute, that it reasonably believes is advisable to perfect the liens granted herein (including, without limitation, the recording of mortgages, the filing of UCC financing statements, the giving of notices and the endorsement of notices on title documents). |
| **Adequate Protection** | The Prepetition Agent under the Existing Primed Secured Facility for the benefit of itself, the Prepetition Lenders and the holders of all other secured obligations thereunder (the "Prepetition Primed Obligations"), shall be granted the following protection (collectively, the "Prepetition Lender Protection"), pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for the consent of such Prepetition Lenders to the priming effectuated by the DIP Facility, consent to the use of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP Facility, and for the diminution in the value (each such diminution, a "Diminution in Value") of the pre-petition security interests of such party, whether or not such Diminution in Value results from the sale, lease or use by the Debtor of the collateral securing the Prepetition Primed Obligations (including, without limitation, Cash Collateral), the priming of the pre-petition security interests of such lender or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise:<br><br>(a) Adequate Protection Lien.  The Prepetition Agent under the Existing Primed Secured Facility, on behalf of itself and the applicable secured creditors and holders shall be granted for their benefit and the benefit of the applicable |

secured creditors, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Debtor (together, the "Adequate Protection Liens"), which liens and security interests are junior and subordinate only to (x) the Carve-Out and (y) the DIP Obligations, the liens securing the DIP Facilities and the DIP Superiority Claims (as defined in the Chapter 11 Order); provided that the Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order.

(b) Superpriority Claim.  The Prepetition Agent under the Existing Primed Secured Facility, on behalf of itself and the applicable secured creditors and holders, shall be granted, subject to the payment of the Carve-Out, a superpriority administrative expense claim junior only to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Administrative Agent; provided that the Prepetition Agent, Prepetition Lenders and secured creditors and holders under the Existing Primed Secured Facility shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the DIP Obligations under the DIP Facility have indefeasibly been paid in cash in full.

(c) Fees and Expenses.  Current cash payments payable under the Prepetition Facility shall be made to the Prepetition Agent (for the benefit of the Prepetition Lenders) of all professional fees and expenses incurred by the Prepetition Agent, including, but not limited to, the fees and disbursements of Milbank Tweed Hadley & McCloy LLP, as counsel to the Prepetition Agent in its role as agent and its administration of the Prepetition Loan Documents, (ii) each local counsel of the Prepetition Agent, in connection with the Prepetition Agent in its role agent and its administration of the Prepetition Loan Documents, and (iii) Loughlin Management + Company, as financial advisor to the Prepetition Agent in its role as agent and its administration of the Prepetition Loan Documents, in each case promptly upon receipt of summary form invoices which may be redacted for privileged information.

Financial Reporting.  The Debtor shall (a) continue to provide the Prepetition Agent and its advisors with financial and other reporting in compliance with the Prepetition Facility and any reporting described herein, (b) shall obtain from Scripps (or any entity acting as the successor to Scripps) and provide to the DIP Administrative Agent and the DIP Lenders, a detailed monthly accounting of the revenues and receipts generated or otherwise received by, and the costs and expenses incurred by, Scripps in connection with the clinical and medical operations at the Facility (as defined in the Prepetition Credit Agreement), and (c) shall provide any other reporting as reasonably required by the DIP Administrative Agent and/or Required DIP Lenders, which the Prepetition Agent shall make available to the DIP Lenders.

Varian, on account of its claims secured by liens on the Debtor's assets, shall be granted adequate protection liens and superpriority claims (collectively, the "Varian Protection") analogous to the Prepetition Lender Protection (but excluding, for the avoidance of doubt, the payment or reimbursement of Varian's fees and expenses)), provided that such Varian Protection shall be junior in priority and subordinate to the Carve-Out, Prepetition Lender Protection, the DIP Obligations, DIP Liens (as defined

| | |
|---|---|
| | in the Chapter 11 Order), the DIP Superpriority Claims (as defined in the Chapter 11 Order) and the Prepetition Facility, the obligations thereunder and all lien and security interests securing such obligations.  Also as part of the Varian Protection, any amounts paid to Varian under that certain Secondment Agreement, dated as of November 6, 2015, between the Debtor and Varian shall not be subject to avoidance and, to the extent any amounts remain unpaid as of the Petition Date, such amounts shall be paid promptly from the proceeds of the DIP Facility.<br><br>Commencing on the later of (i) March 1, 2017 and (ii) the Petition Date (such date, the "<u>Commencement Date</u>") and continuing until the Maturity Date of the DIP Facility (the "<u>DIP Period</u>"):    (1) the Company shall pay Varian $350,000 plus consumable parts and other excluded spares (as defined in the Maintenance Agreement) per calendar month in cash in connection with Varian's services provided under the Maintenance Agreement (the "<u>Cash Pay Amount</u>"); provided, however, that (x) if the Commencement Date occurs subsequent to the first day of a calendar month, the $350,000 portion of the Cash Pay Amount for such first month shall be prorated on a *per diem* basis beginning with the Commencement Date and (y) if the Maturity Date occurs prior to the end of a calendar month, the $350,000 portion of the Cash Pay Amount for such month shall be prorated on a *per diem* basis through and including the Maturity Date; and (2) the Company shall accrue the difference between the Cash Pay Amount and the contractual amounts that otherwise come due under the Maintenance Agreement during the DIP Period (the "<u>Accrual Amount</u>"). Until the Accrual Amount is paid in full, in cash, the Accrual Amount shall be senior in priority and paid to Varian prior to any repayment of (i) principal or interest under the DIP Facility; or (ii) principal or interest under the Prepetition Facility.  For purposes of this paragraph, "repayment" shall not include the credit bid or equitization of a claim or an acquisition by the Lenders of the Company's assets (whether through a plan of reorganization, a sale pursuant to section 363 of the Bankruptcy Code, a foreclosure, a deed in lieu of foreclosure, or any other exercise of rights or remedies) but shall include any subsequent monetization thereof (whether on account of a sale, refinancing, stock repurchase, dividend, or otherwise) |
| **Closing Date** | The date on or about the Interim Order Entry Date on which the specified portion of the commitment is made available for borrowings under the DIP Facility (the "<u>Closing Date</u>"), which shall be no later than three business days after the Interim Order Entry Date, subject to satisfaction (or waiver by the Required DIP Lenders) of the applicable conditions precedent set forth herein. |
| **Maturity** | Borrowings shall be repaid in full, and the commitment shall terminate, on the earliest to occur (the "<u>Maturity Date</u>") of, among other things, (i) three (3) months from the Closing Date (the "<u>Initial Maturity Date</u>"); provided that the Initial Maturity Date shall automatically extend for an additional three (3) month period (the "<u>Initial Extension</u>") and extend again from the date of the Initial Extension to October 31, 2017 (the "<u>Final Extension</u>"), provided that (a) no Event of Default has occurred and is continuing or (b) unless the DIP Administrative Agent at the direction of the Required DIP Lenders delivers a notice two (2) weeks prior to the Maturity Date that such Extension shall not be granted, (ii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1102(2) of the Bankruptcy Code) of a plan of reorganization ("<u>Plan of Reorganization</u>") in the Chapter 11 Case that has been confirmed by an order of the Bankruptcy Court, (iii) the date the Bankruptcy Court orders (x) the conversion of the Debtor's bankruptcy case to a Chapter 7 liquidation or (y) a dismissal of the Debtor's bankruptcy case, (iv) the date of |

| | |
|---|---|
| | consummation of a sale of all or substantially all of the Debtor's assets or stock pursuant to section 363 of the Bankruptcy Code, (v) the acceleration of the loans or termination of the commitments under either of the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default, and (vi) the date that is 30 days (unless extended by the Required DIP Lenders) after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date.<br><br>Any confirmation, conversion or dismissal order entered in the Chapter 11 Case shall not discharge or otherwise affect in any way any of the obligations of the Company to the DIP Lenders under the DIP Facilities and the DIP Loan Documents, other than after the payment in full and in cash, to the DIP Lenders of all DIP Obligations under the DIP Facility and the DIP Loan Documents on or before the effective date of a Plan of Reorganization or any conversion or dismissal order and the termination of the commitments. |
| **Interest Rate/Default Interest Rate/Fees** | The interest rate, default rate and fees are appended as <u>Annex III</u> hereto.<br><br>Interest shall accrue on the principal balance of the DIP Loan, from time to time, based on a 360 day year and charged for the actual number of days outstanding. Borrower shall pay interest, default interest and any fees monthly in arrears. So long as no Event of Default has occurred and is continuing, the Borrowers may pay all or a portion of the interest accrued in a particular interest period in kind ("PIK Interest"), in lieu of paying such interest in cash, by adding such interest to the principal amount of the outstanding Loans. |
| **Conditions to DIP Closing** | <u>**Conditions to Interim Facility**</u><br><br>1. Interim Order/Bankruptcy Matters.<br><br>    (a) The Chapter 11 Case shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Case or shortly thereafter shall have been reviewed in advance by the DIP Lenders and shall be in form and substance acceptable to the Required DIP Lenders.<br><br>    (b) The Bankruptcy Court shall have (i) entered an Interim Order as to the DIP Facility which Interim Order shall be in form and substance satisfactory to the sole discretion of the Required DIP Lenders, and (ii) authorized, confirmed and approved all terms and provisions of this DIP Facility and related DIP Loan Documents. The Company shall be in compliance in all respects with the Interim Order.<br><br>    (c) All first day orders entered by the Bankruptcy Court, including but not limited to, pertaining to cash management, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Administrative Agent in its sole discretion.<br><br>    (d) The Prepetition Agent, Prepetition Lenders, and Varian shall have received adequate protection in respect of the Liens securing their prepetition |

obligations.

(e) The DIP Secured Parties shall have been granted, pursuant to the Chapter 11 Order, a perfected, first priority lien on all Collateral and shall have received UCC, tax and judgment lien searches, real estate title searches, and other appropriate evidence, evidencing the absence of any other liens or mortgages on the collateral, except the liens securing the Prepetition Facilities and the Permitted Exceptions.

(f) Delivery of UCC-1 financing statements for filing under the Uniform Commercial Code in the jurisdiction or organization of the Company.

2. Budgets.

The DIP Secured Parties shall have received the Initial Budget, which Initial Budget shall be in form and substance satisfactory to the DIP Lenders.

3. Closing Documents.

(a) The DIP Administrative Agent shall be satisfied that the Debtor has complied with all other closing conditions, including, without limitation:    (i) the delivery of corporate records and documents from public officials, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third party and governmental consents necessary in connection with the DIP Facility, the financing thereunder and related transactions.    The Debtor and the transactions contemplated herein shall be in compliance with all applicable laws and regulations.    The DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to each DIP Lender.

(b) Execution and delivery by the Debtor of the DIP Loan Documents evidencing the loans made and to be made under the DIP Facility.

**Conditions to Full Availability**

Not later than 30 days following the Interim Order Entry Date (unless such date is extended by the Required DIP Lenders), a Final Order as to the DIP Facility which Final Order shall be in form substantially consistent with this DIP Facility and with such changes or modifications to the Interim Order as are approved by the Required DIP Lenders.

**Conditions to All Loans**:

(a) The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(b) All "Conditions to the Interim Facility" remain true and correct and have been

satisfied in a manner satisfactory to the DIP Administrative Agent.

(c) The Debtor shall be in compliance with each Chapter 11 Order, the Interim Order (prior to entry of the Final Order), the Final Order and the DIP Facility.

(d) The DIP Administrative Agent and the DIP Lenders shall have received (i) all periodic updates required under the Budget, (ii) the Reconciliation Report, and (iii) all other deliverables pursuant to the DIP Loan Documents.

(e) All costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated herein and by the other DIP Loan Documents (and any such amounts owing pursuant to the Prepetition Facility) to be payable shall have been paid to the extent due and the Debtor shall have complied in all respects with all of its other obligations to the DIP Administrative Agents and DIP Lenders.

(f) Except as disclosed, since December 31, 2016 no event that constitutes a Material Adverse Effect (as defined below) in the operations, assets, revenues, financial condition, profits or prospects of the Debtor (other than by virtue of the commencement of the Chapter 11 Case) shall have occurred.

(g) No trustee, examiner or receiver shall have been appointed or designated with respect to the Company, properties or assets and no motion filed by a Debtor Party, or any other person other than a Debtor Party that is not contested in good faith by the Debtor, shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over Collateral.

(h) There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality (i) which relates to the DIP Facility or the transactions contemplated thereby or (ii) which is not (A) disclosed in a schedule to the DIP Credit Documents or (B) otherwise stayed by 11 U.S.C. § 362.

(i) No Event of Default has occurred and is continuing.

(j) The representations and warranties of the Debtor contained herein or any other DIP Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date hereof.

(k) No notice shall exist of any challenge by a Debtor Party or by any person other than a Debtor Party that is not contested in good faith by the Debtor, of any priority, superpriority, lien, claim, right or remedy of the DIP Secured Parties, the Prepetition Lenders or Prepetition Agent with respect to the Collateral, property, or assets of the Debtor or with respect to this DIP Facility and any Chapter 11 Order.

(l) Satisfaction of any other condition requested by the Required DIP Lenders that arises out of or related to the proposed use of funds.

(m) On the Petition Date the Company shall have maintained the engagement of a

<table>
<tr><td></td><td>

Chief Restructuring Officer and an investment banker acceptable to each DIP Lender, which engagements shall be approved by the Bankruptcy Court no later than twenty-one days after the Petition Date.

"Material Adverse Effect" means that the matter in question could reasonably be anticipated to materially and adversely affect (a) a party's ability to perform its obligations under any of the DIP Loan Documents, (b) Borrower's ability to operate the Property in conformance with the then current Budget, (c) the value, cash flow or marketability of the Collateral, either presently or as contemplated to be operated, constructed, used, leased or configured pursuant to the then current business plan of Debtor as approved by DIP Administrative Agent, (d) enforceability of any DIP Loan Document or the perfection or priority of any lien created under any DIP Loan Document, or (e) the business operations, economic performance, assets or condition (Financial or otherwise) of Debtor.

</td></tr>
<tr><td>

**Covenants**

</td><td>

The provisions of the Agreed Covenants of the Prepetition Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Lenders and the Debtor, as applicable, the Debtor covenants and agrees that it shall perform and observe each of the covenants set forth in the Agreed Covenants of the Prepetition Credit Agreement as if (i) each reference therein to "Lender" and similar expressions were references to the DIP Lender under this DIP Facility, (ii) each reference therein to "Default" or "Event of Default" and similar expressions were references to "Default" or "Event of Default", respectively, under this DIP Facility and (iii) each reference to "Agreement" were references to this DIP Facility.

"Agreed Covenants" means, except for such exceptions expressly approved by the Required DIP Lenders in writing, the following covenants from the Prepetition Credit Agreement: Sections 5.1.1 (Financials), 5.1.2 (Impositions), 5.1.3(a), (b), (d) thru (h) (Insurance), 5.1.4 (a) thru (f) (Leases), 5.1.5 (Operations), 5.1.6 (Prohibition on Conveyance and Liens), 5.1.7 (Single Purposes Entity/Change in Structure), 5.1.8 (Environmental Matters), 5.1.9 (Terrorism and Anti-Money Laundering), 5.1.10 (Anti-Forfeiture), 5.1.11 (Assumption in Non-Consolidation Opinion), 5.2.6 (Notices), 5.3.1 (Inspections), 5.3.2 (Further Assurance), 5.3.2 (Interest Rate Agreements), 5.3.4 (Stamp Tax), 5.3.5 (Reports), 5.3.6 (Indemnity), 5.3.7 (No Dividend or Distributions), ( 5.3.8 (Notice of Proceeding), 5.3.9 (Appraisals), 5.3.10 (Affiliate Transactions), 5.3.11 (Notice of Default), 5.3.13 (Place of Business), 5.3.14 (Cooperate in Legal Proceeding), 5.3.15 (Debt Cancelation), and 5.3.16 (Operating Obligations).

**Additional Covenants**:

(a) Budget Permitted Deviation.   The Debtor shall deliver a monthly report/reconciliation to the DIP Secured Parties on the seventh (7) day of the immediately preceding month, the actual and budgeted results for such month by line item in the Budget and the cash receipts, together with a reasonably detailed written explanation of all Revenue Permitted Deviations and Disbursements Permitted Deviation, which report shall be in form and substance satisfactory to the DIP Lenders and the Debtor ("Reconciliation

</td></tr>
</table>

Report"). In addition, the Debtor shall notify the DIP Administrative Agent as soon as reasonably practicable if the Debtor anticipates that it will exceed the Revenue Permitted Deviation or the Disbursements Permitted Deviation for any Budget Test Period.

(b) Chapter 11 Cases Filings. The Company shall deliver to the DIP Administrative Agent and its counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtor with the Bankruptcy Court in the Chapter 11 Case, or distributed by or on behalf of the Debtor to any official committee appointed in the Chapter 11 Case.

(c) Delivery of Information. The Company shall deliver to the DIP Secured Parties any and all information and developments in connection with any proposed transaction or change of control and any other event or condition which is reasonably likely to have a Material Adverse Effect on the Debtor, the DIP Loans or the Chapter 11 Case, including, without limitation, the progress of any proposed or confirmed Chapter 11 plan of reorganization. Information related to 13 week cash flow forecast, patient count projection and patient pipeline to be provided on a weekly basis and information related to financial statements, bank statements and bank reconciliations, SCRIPPS budget to actual monthly reconciliation, account receivable aging schedule, accounts receivable rolling schedule, appeals report, marketing and advertising spend schedule and FTE analysis to be provided on a monthly basis.

(d) CRO. A Chief Restructuring Officer and an investment banker acceptable to each DIP Lender shall be engaged prior to the Petition Date and approved by the Bankruptcy Court within 21 days of the Petition Date.

(e) Patient Care Ombudsman. Within 30 days of the Petition Date, the Bankruptcy Court shall have entered an order requiring the appointment of a patient care ombudsman in the chapter 11 case pursuant to section 333 of the Bankruptcy Code; provided that this requirement will not apply to the extent the Required DIP Lenders determine in their sole discretion that the Chief Restructuring Officer can provide the oversight functions of the patient care ombudsman.

(f) Varian Services. The Budget shall provide, and the Debtor shall pay Varian for postpetition services provided by Varian to the Debtor pursuant to that certain Proton System Operations and Maintenance Agreement dated June 29, 2011 (the "Maintenance Agreement"); provided that the Borrower shall not pay Varian for any prepetition services provided under the Maintenance Agreement (including, but not limited to, any accrued, outstanding or past due amounts owing to Varian under the Maintenance Agreement) except pursuant to a Plan of Reorganization or a cure payment under Bankruptcy Code section 365.

**Negative Covenants**: The Debtor covenants and agrees that, so long as any DIP Lender shall have any Commitment hereunder or any DIP Loan or other DIP

Obligation remains outstanding, it shall not:

(a) Create or permit to exist (i) any administrative expense, unsecured claim, or other claim or lien on the Collateral, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than pursuant to the Prepetition Lender Protection.

(b) Make any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Chapter 11 Order, other than as agreed in writing by the Required DIP Lenders.

(c) Create or permit to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility, any Permitted Exceptions, and Varian's prepetition and adequate protection liens.

(d) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated under "Adequate Protection" herein or payments agreed in writing by the Required DIP Lenders and authorized by the Bankruptcy Court.

(e) Declare or make any dividend, payment or other distribution directly or indirectly of cash or a non-cash asset on account of equity or ownership interests.

**Financial Covenants**:

(a) The proceeds of the DIP Loans and all proceeds of Collateral shall be used by the Debtor solely for the purposes of and up to the amounts set forth in the Budget, subject to the Revenue Permitted Deviation and the Disbursements Permitted Deviation.

(b) If at any time there is a Deficiency, the Borrower shall promptly, but in no event later than 3 days after it reasonably believes a Deficiency exists, notify the DIP Administrative Agent.

"Deficiency" means, with respect to the Budget, if at any time the projected disbursements of the Borrower for the DIP Period exceeds (i) the projected Revenues to be collected for the DIP Period and (ii) the remaining availability of the Commitments.

**363 Sale Milestones Covenant**:

The following events shall constitute the 363 sale milestones (each, a "363 Sale Milestone"):

(a) As promptly as possible but in no event later than 30 calendar days after the Petition Date (the "Sale Motion Filing Date"), the Debtor shall file a motion seeking (i) the entry of an order approving the sale of all or substantially all of the Company's assets (the "363 Sale") pursuant to section 363 of the Bankruptcy Code and (ii) approval of the Bidding Procedures Order (as

defined below);

(b) Within 21 calendar days after the Sale Motion Filing Date, the Bankruptcy Court shall enter an order (i) approving bidding procedures for the 363 Sale and (ii) scheduling the date for an auction, if necessary, and the hearing to consider approval of the 363 Sale.  Such order (the "<u>Bidding Procedures Order</u>") will specify that (x) the DIP Lenders, and any designees thereof, have the unconditional right to credit bid for any and all assets subject only to a senior lien in favor of the DIP Facility offered for sale by the Company, (y) subject to payment in full in cash of the DIP Obligations, the Prepetition Agent (upon the direction of the Prepetition Required Lenders) shall have the unconditional right to credit bid for any and all assets subject only to a senior lien in favor of the Prepetition Secured Parties offered for sale by the Company, and that any other bids must include sufficient cash purchase price to pay off the DIP Facility in cash and in full;

(c) The Bidding Procedures Order shall provide that bids shall be due within 60 calendar days after entry of the Bid Procedures Order (the "<u>Bid Deadline</u>");

(d) Within three (3) business days after the Bid Deadline, the Debtor shall have commenced the auction, if necessary, pursuant to the Bid Procedures Order;

(e) Within ten (10) business days after the Bid Deadline, the Bankruptcy Court shall have entered an order approving the 363 Sale; and

(f) Upon 25 calendar days after the Bid Deadline or 5 calendar days after all necessary regulatory approvals are completed, the Debtor shall have consummated the 363 Sale to the winning bidder or bidders.

(g) The Bid Procedures Order, the bidding procedures and the 363 Sale order shall each be in form and substance satisfactory to the Required DIP Lenders.

| | |
|---|---|
| **Reps and Warranties** | The Company represents and warrants to the DIP Lenders and the DIP Administrative Agent that (i) subject to the entry and terms of the Chapter 11 Order, the execution of this DIP Facility has been duly authorized and this DIP Facility has been duly and validly executed and delivered by the Debtor and constitutes the Debtor's legal, valid and binding obligation, enforceable against it in accordance with its terms; and (ii) the provisions of Section 4.1, Section 4.1.1, Section 4.1.2 (other than 4.1.2(e), 4.1.2(f), and 4.1.2(k)), Section 4.1.4 and Section 4.1.5 of the Prepetition Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* for the benefit of the DIP Lenders, and the Company hereby makes each of the representations and warranties in Section 4.1, Section 4.1.1, Section 4.1.2, Section 4.1.4 and Section 4.1.5 of the Prepetition Credit Agreement as if (A) each reference therein to "this Agreement" included reference to this DIP Facility, (B) each reference therein to "Borrower" were references to Debtor or Company, as applicable, (C) each reference therein to "Closing Date" were references to the date hereof and (D) each reference therein to "Indebtedness" includes all DIP Obligations. |
| **Prepayments** | <u>**Voluntary Prepayment**</u>: The Debtor may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the commitments, in each case in full but not in part. |

**Mandatory Prepayment**:

(a) <u>Asset Dispositions</u>.  (i) Immediately upon receipt by the Company of net cash proceeds from any asset disposition on Collateral, the Company shall prepay the DIP Obligations in an amount equal to 100% of the proceeds so received in excess of such amount; provided that the Debtor shall not sell assets unless (i) such sale is pursuant to the 363 Sale Milestones covenant set forth herein or (ii) the proceeds of such sale are sufficient to pay (and shall be used to pay) the DIP Obligations in full in cash and to pay the obligations and amounts under the Prepetition Facility.

(b) <u>Casualty Events and Extraordinary Receipts</u>.  The Company immediately shall (i) prepay the DIP Obligations in an amount equal to 100% of such proceeds received by the Company from Casualty Events with respect to Collateral and (ii) prepay the DIP Obligations in an amount equal to 100% of all other Casualty Events or Extraordinary Receipts with any excess above the DIP Obligations to be used to repay obligations and amounts under the Prepetition Facility.

(d) <u>Incurrence of Indebtedness</u>.  Immediately upon the incurrence or issuance by the Company of any indebtedness (other than ordinary course trade debt subject to the limitations set forth in the Prepetition Loan Documents), the Company shall prepay the DIP Obligations in an amount equal to 100% of such net cash proceeds so received; provided that the Debtor shall not incur or issue additional postpetition indebtedness or grant or request authority to grant any lien or security interest to secure postpetition indebtedness unless the amount of such debt shall be sufficient to pay (and shall be used to pay) the DIP Obligations in full in cash and to the extent the net cash proceeds so received do not pay in full in cash all obligations under the Prepetition Facility, such indebtedness shall be junior, subject and subordinate, in all respects to all rights, title, interests, liens, claims, liabilities and obligations under the Prepetition Facility.

(e) <u>Equity Issuances</u>.  Within two business days after any equity issuance the Debtor shall prepay the DIP Obligations in an amount equal to 100% of the net cash proceeds of such equity issuance with any excess above the DIP Obligations to be used to repay obligations and amounts under the Prepetition Facility.

"<u>Casualty Event</u>" means, with respect to any property (including any interest in property) of the Company, any loss of, damage to, destruction of, or condemnation or other taking of, such property for which Company receives insurance proceeds, proceeds of a condemnation award or other compensation.

"<u>Extraordinary Receipt</u>" means any cash received by or paid to or for the account of the Company not in the ordinary course of business, including, tax refunds, pension plan reversions, proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments (including, without limitation, in connection with any acquisition) and any purchase price adjustments (including, without limitation, in connection with any acquisition).

| | |
|---|---|
| **Events of Default** | The occurrence of any of the following events shall constitute an event of default (each, an "<u>Event of Default</u>"):

(a) the Debtor shall fail to pay (i) any principal of the DIP Loans when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment; or (ii) within three business days, any interest on the DIP Loans, the fees or other sums due hereunder, when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment.

(b) The Debtor shall fail to comply with any of the terms, conditions or covenants or its obligations under any Chapter 11 Order or the other DIP Loan Documents and such failure remains uncured for three business days.

(c) Any of the 363 Sale Milestones shall not have been timely satisfied.

(d) The Chapter 11 Case shall be dismissed or converted to a Chapter 7 case under the Bankruptcy Code.

(e) A trustee, examiner or receiver with enlarged powers shall be appointed or designated in any of the Chapter 11 Case.

(f) Except as expressly set forth in the Interim Order, the Final Order or this DIP Facility, the Company (1) incurs any additional postpetition indebtedness (other than ordinary course trade debt, subject to the limitations set forth in the Prepetition Loan Documents) or (2) grants or requests authority to grant any lien or security interest to secure such postpetition indebtedness.

(g) Any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Debtor shall apply for authority to do so) without the written consent of the Required DIP Lenders or any Chapter 11 Order shall cease to be in full force and effect.

(h) The Final Order Entry Date shall not have been occurred within 30 days after the Interim Order Entry Date (unless such date is extended by the Required DIP Lenders).

(i) A Debtor Party shall take any action, including the filing of an application, in support of any of (a) through (g) hereof, or any person other than the Debtor shall do so and such application is not contested in good faith by the Debtor.

(j) A Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition claim other than (x) as provided for in a First Day Order and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a Material Adverse Effect on the Debtor or its estate, or (iii) approving any settlement or other stipulation not approved by the Required |

DIP Lenders and not included in the Budget with any secured creditor of the Debtor providing for payments as adequate protection or otherwise to such secured creditor.

(k) The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any material asset of the Debtor.

(l) Any material contract is rejected or otherwise terminated or any material property of the Debtor is sold, in each instance, without the prior written consent of the Required DIP Lenders.

(m) A Debtor Party files a motion without the express written consent of Required DIP Lenders or any person other than a Debtor Party shall do so and such application is not contested in good faith by the Debtor and such motion is not granted, to obtain additional financing from a party other than DIP Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code.

(n) Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(o) The Debtor shall support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Secured Parties seeking confirmation of the amount of the DIP Secured Parties' claim or the validity and enforceability of the Liens in favor of the DIP Administrative Agent.

(p) (A) Any Debtor Party shall seek to, shall support, acquiesce in, or not challenge (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or on behalf of the Debtor) any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the DIP Obligations or to challenge the validity and enforceability of the Liens in favor of the DIP Administrative Agent or contest any material provision of any DIP Loan Document, (B) such Liens and/or superpriority claims shall otherwise cease to be valid, perfected and enforceable in all respects, or (C) or any provision of any DIP Loan Document shall cease to be effective.

(q) Any judgments which are in the aggregate in excess of $50,000 (not covered by insurance), as to any postpetition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed.

(r) (A) Any Debtor Party shall file any pleading or proceeding which could reasonably be expected to result in an impairment of the rights or interests of the DIP Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other person which results in such impairment of the rights or interests of the DIP Lenders.

(s) The Debtor shall fail to execute and deliver to the DIP Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the

Administrative Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Secured Parties.

(t) The Debtor shall fail to pay at maturity, or within any applicable period of grace, any obligation for indebtedness in excess of $100,000, or fail to observe or perform any material term, covenant or agreement (other than any such obligation with respect to which the Bankruptcy Code prohibits the Debtor from complying with such obligation or permits the Debtor not to comply with such obligation) contained in any agreement by which it is bound, evidencing or securing Indebtedness in excess of $100,000 for such period of time as would permit (assuming the lapse of time and/or giving of appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof.

(u) There shall occur, in any single event or in a series of events (related of unrelated) any damage to, or loss, theft or destruction of, any Collateral in an amount greater than $50,000 that is not covered by insurance.

(v) (i) Any Debtor Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Administrative Agent and/or the DIP Lenders, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Interim Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Debtor which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Administrative Agent and/or the DIP Lenders created by the Interim Order.

(w) Any Debtor Party take any action that would adversely affect the rights, remedies, claims, liens or recovery of the DIP Lenders and/or the Prepetition Agent and Prepetition Lenders.

(x) Any party, including, but not limited to, the Debtor, files a plan of reorganization or a motion to sell all or substantially all of the Debtor's assets, in either case, without the express prior written consent of the Required DIP Lenders (other than as contemplated under this Agreement).

| | |
|---|---|
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Administrative Agent may, in its sole discretion, and at the direction of the DIP Lenders holding at least a majority of the outstanding Commitments shall (without further notice or grace period, unless required by applicable law), in its sole discretion, take any or all of the following actions: (i)(1) declare all obligations under this DIP Facility to be immediately due and payable, (2) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Administrative Agent and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or postpetition administrative superpriority claim status; (ii) declare a termination, reduction or restriction on the ability of the Debtor to use any cash |

collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Company, the official committee of creditors of the Company (if applicable) and the United States Trustee (if applicable), (iii) exercise the rights of a secured party upon default under the UCC and/or (iv) exercise any and all rights and remedies available under any of the Prepetition Loan Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral.

Following seven (7) business days' notice of such Event of Default to the Debtor, any official committee of unsecured creditors, and the U.S. Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Administrative Agent and the DIP Lenders shall have relief from the automatic stay to exercise remedies under the DIP Loan Documents.

Notwithstanding the foregoing, irrespective of the occurrence and continuation of an Event of Default and the provisions set forth above, the DIP Lenders and the DIP Administrative Agent shall not sweep any funds of the Debtor, the sweeping of which would reasonably be expected to adversely affect patient care; provided that this limitation shall not apply if Scripps fails to perform in any respect under the Facility Lease or the Debtor is no longer treating or scheduled to treat patients.

The Company and the DIP Secured Parties hereby irrevocably authorize the DIP Administrative Agent, upon the direction of the Required DIP Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Section 363 of the Bankruptcy Code of the United States or any similar laws in any other jurisdictions to which the Company is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by the DIP Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law.  In connection with any such credit bid and purchase, the DIP Obligations owed to the DIP Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with DIP Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of the DIP Administrative Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of the DIP Administrative Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the DIP Secured Parties whose DIP Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their DIP Obligations credit bid in relation to the aggregate amount of DIP Obligations so credit bid) in the asset or assets so purchased (or in the capital stock of the acquisition vehicle or vehicles that are used to consummate such purchase).  Upon request by the DIP Administrative Agent or the Company at any time, the DIP Secured Parties will confirm in writing the DIP Administrative Agent's authority to release any such liens on particular types or items of Collateral pursuant to this section.

The DIP Secured Parties acknowledge that, subject to payment in full in cash of the DIP Obligations, the Prepetition Agent (upon the direction of the Prepetition Required Lenders) may credit bid all or any portion of the Collateral subject to a senior lien in

| | |
|---|---|
| | favor of the Prepetition Secured Parties offered for sale in accordance with the procedures in the preceding paragraph, and that any other bids must include sufficient cash purchase price to pay off the DIP Facility in cash in full. |
| **Costs; Indemnity** | <u>Costs and Expenses</u>.  The Debtor shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the DIP Administrative Agent, the DIP Lenders and their respective affiliates (including, in each case, the reasonable fees, charges and disbursements of counsel and advisors for such persons, including, without limitation, local counsel to such persons in any relevant jurisdiction), in connection with the preparation, negotiation, execution, delivery and administration of the DIP Facility and the DIP Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all documented out-of-pocket expenses incurred by the DIP Administrative Agent and the DIP Lenders (including, in each case, the fees, charges and disbursements of counsel (including, without limitation, local counsel to such persons in any relevant jurisdiction) and advisors for the Lenders) in connection with the enforcement or protection of its rights (A) relating to or arising out of, in connection with or the result of the DIP Facility and the DIP Loan Documents, (B) relating to or arising out of, in connection with, or as a result of, the DIP Loans made hereunder, including all such documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans or (C) relating to or arising out of, in connection with or the result of the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and/or response to any subpoena or document request) related to the DIP Facility, the DIP Loan Documents or the DIP Loans in any action, litigation, investigation, or proceeding.<br><br><u>Indemnification by the Debtor</u>.  The Debtor shall indemnify the DIP Administrative Agent (and any sub-agent thereof), each DIP Lender and each related party of any of the foregoing persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, costs and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any person (including the Debtor) arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Facility, any DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the DIP Administrative Agent (and any sub-agent thereof) and its related parties only, the administration of the DIP Facility and the DIP Loan Documents, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any breach or violation by the Company of its obligations under, or any misrepresentation by the Company contained in, this DIP Facility or the other DIP Loan Documents, or (iv) any other action or inaction by, or matter which is the responsibility of, the Company, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by or on behalf of any person (including the Debtor), and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the |

| | extent that such losses, claims, damages, liabilities, costs or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, if the Debtor has obtained a final and nonappealable judgment in their favor on such indemnification claim by such Indemnitee as determined by a court of competent jurisdiction.  This provision shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.   It is understood and agreed that the indemnification obligations under the Prepetition Facilities shall survive the Closing Date and the repayment of the DIP Loans and exercise of any remedies in connection therewith and shall continue as indemnification obligations hereunder following the Closing Date or exercise of any such remedies subject to the terms hereof. |
|---|---|
| **Voting; Waiver; DIP Administrative Agent Action** | **Required DIP Lenders**:  "Required DIP Lenders" means the consent or approval, as applicable, of the following shall be obtained:  (i) ORIX Capital Markets, LLC ("ORIX"), if ORIX is the DIP Administrative Agent, and (ii) DIP Lenders (which for this clause (ii) may include ORIX in its capacity as a DIP Lender) holding more than 50% of the aggregate undrawn commitments and outstanding DIP Loans (the "Required DIP Lenders").   The vote of Required DIP Lenders shall be required to amend, waive or modify the DIP Facility; provided that the consent of all DIP Lenders is required for any Major Decision.

**Voting Requirements**:   The DIP Administrative Agent shall have all necessary power, right and obligation to take any and all action of the type specified herein or any other DIP Loan Document as being within DIP Administrative Agent's or DIP Lender's right, powers or discretion, except (i) with respect to Major Decision, only in accordance with directions from all DIP Lenders, and (ii) in all other events that under the terms of the DIP Loan Documents expressly require the consent, approval or agreement of DIP Lenders or Required DIP Lenders, as applicable.

**Waiver and Amendment**:   This DIP Facility and the other DIP Loan Documents constitute the entire agreement between the parties hereto, and no modification, waiver, amendment, discharge or change of this DIP Facility or any other DIP Loan Document nor any provision hereof or thereof shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought; provided that, (a) the DIP Administrative Agent may amend, modify or supplement any other provision unless such action expressly requires the consent of the DIP Lenders or Required DIP Lenders or constitutes a Major Decision (as defined below) and (b) no amendment, waiver or consent shall, unless in writing and signed by all DIP Lenders, do any of the following:  (i) reduce the principal of, or interest on, the DIP Loans or any fees due hereunder or any other amount due hereunder or under any other DIP Loan Document; (ii) postpone any date fixed for any payment of principal of, or interest on, the DIP Loans or any fees due hereunder or under any other DIP Loan Document; (iii) release any material portion of the Collateral or other collateral for the DIP Loan; (iv) increase the DIP Loans amount; (v) change the definition of "DIP Lenders" or "Required DIP Lenders" or a requirement for approval thereof; (vi) any modification to the requirement that all repayments be applied pro rata to the DIP Lenders; (vii) change the amount of the Commitment of any DIP Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant, mandatory prepayment or Default shall constitute a |

| | |
|---|---|
| | change in the individual Commitment of any DIP Lender); or (viii) alter the protections for Varian contained herein (the foregoing items (i) through (viii) are collectively known as "Major Decisions"). |
| **Removal of DIP Administrative Agent.** | **Removal of the DIP Administration Agent**: The DIP Administrative Agent may be removed by the 100% vote of the non-ORIX DIP Lenders only upon and after a court of competent jurisdiction, after exhaustion of all appeals, finds and rules that DIP Administrative Agent acted with gross negligence or intentional misconduct in the performance of its duties and obligations under this DIP Facility; provided however that, in the event that ORIX is no longer a DIP Lender hereunder, then DIP Administrative Agent may be removed by an affirmative vote of DIP Lenders holding at least a majority of the outstanding Commitments. |
| **Assignments and Participations** | Any DIP Lender may, with the prior written consent of DIP Administrative Agent, which shall not be unreasonably withheld or delayed, at any time or times and without the Debtor's consent, grant any participation in its share of the DIP Loan to one or more Persons not an affiliate of the Company (each a "Participant"). In the event of any such grant by a DIP Lender of a participation to a Participant, such DIP Lender shall remain responsible for the performance of its obligations hereunder, and DIP Administrative Agent shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations hereunder, and DIP Administrative Agent shall have no obligation to communicate with, give any notice to, make any payment to or take any direction from, any Participant.<br><br>Any DIP Lender may, with the prior written consent of the DIP Administrative Agent, which shall not be unreasonably withheld or delayed, at any time or times and without the Company's consent, make an assignment of its pro rata share of the DIP Loans to an Eligible Lender (as defined in the Prepetition Credit Agreement) (such assignment a "DIP Loan Transfer") not an affiliate of the Debtor (such assignee, an "Assignee") subject to the following conditions: (i) the Assignee shall execute and deliver to DIP Administrative Agent, for its approval, acceptance and recording in a register maintained by DIP Administrative Agent, an assignment satisfactory to the DIP Administrative Agent, together with a processing and recordation fee of $5,000 for the DIP Administrative Agent's own account; (ii) the principal amount of any assigned DIP Loan Commitment shall be not less than all of such DIP Lender's pro rata share of the DIP Loans; (iii) each such DIP Loan Transfer shall be to an Eligible Lender; and (iv) the Assignee and/or the assigning DIP Lender shall pay to the DIP Administrative Agent all of the DIP Administrative Agent's reasonable costs and expenses incurred in connection with such DIP Loan Transfer. Upon such execution, delivery, approval, acceptance and recording, from and after the effective date of such assignment, (1) Assignee thereunder shall be a party to this Agreement and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of a DIP Lender hereunder and (2) the assigning DIP Lender thereunder shall to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Agreement arising from and after the date of such assignment. |
| **Prepetition Guarantor Release** | The Prepetition Secured Parties agree to provide the Prepetition Guarantors a release upon the later of (x) the consummation of a 363 Sale and (y) consummation of a Plan of Reorganization or plan of liquidation, in each case, acceptable to Required DIP |

| | Lenders; provided that such Prepetition Guarantors take no adverse action against the DIP Secured Parties or the Prepetition Secured Parties during the Chapter 11 Cases, including without limitation any action that would cause an Event of Default under this DIP Facility. |
|---|---|
| **Governing Law** | The Debtor submits to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of New York; and shall waive any right to trial by jury.<br><br>New York law shall govern this DIP Facility and the DIP Loan Documents except to the extent preempted by federal bankruptcy laws. |
| **Modification of Prepetition Loan Documents** | Nothing herein is intended to or shall modify waive or amend any obligations of the Debtor or any other party under the Prepetition Loan Documents or the rights, relative priority or interests of the Prepetition Lenders under the Prepetition Loan Documents. |

**Annex I**

**Part A – New Money Loans Commitment**

| DIP Lender | New Money Loans | Percentage |
|---|---|---|
| ORIX CAPITAL MARKETS, LLC | $4,563,604.80 | 28.52253% |
| VARIAN MEDICAL SYSTEMS INTERNATIONAL, AG | $7,329,150.40 | 45.80719% |
| JPMORGAN CHASE BANK, N.A. | $4,107,244.80 | 25.67028% |
| Total | $16,000,000 | 100% |

**Part B – Roll-Up Commitment**

| DIP Lender | Tranche A Roll-Up Percentage | Tranche C Roll-Up Percentage |
|---|---|---|
| ORIX CAPITAL MARKETS, LLC | 30.25000% | 28.52253% |
| VARIAN MEDICAL SYSTEMS INTERNATIONAL, AG | 42.52677% | 45.80719% |
| JPMORGAN CHASE BANK, N.A. | 27.22323% | 25.67028% |
| Total | 100% | 100% |
| Total Roll-Up Amount | $16,000,000 | |

## Annex II

1.      A notice of assessment recorded March 04, 1998 as Instrument No. 1998-116869 of Official Records, executed by City Council of the City of San Diego.

2.      The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

3.      Water rights, claims or title to water, whether or not shown by the public records.

4.      An easement for electric transmission lines, telephone and incidental purposes, recorded May 28, 1940 as Book 1036, Page 99 of Official Records.
In Favor of:                                San Diego Gas and Electric Company
Affects:                                As described therein

5.      An easement for electric transmission, telephone and incidental purposes, recorded October 11, 1940 as Book 1080, Page 361 of Official Records.
In Favor of:                                San Diego Gas and Electric Company
Affects:                                As described therein

6.      A Corporation Grant Deed which contains Covenants, Conditions, and Restrictions, but omitting, except to the extent permitted by any applicable federal or state law, covenants or restrictions, if any, based on race, color, religion, sex, familial status, national origin, handicap, sexual orientation, marital status, ancestry, source of income, disability, medical condition, or other unlawful basis.

Recorded:  November 10, 1950 in Book 3856, Page 197 of Official Records

Said Covenants, Conditions, and Restrictions provide that a violation thereof shall not defeat or render Invalid the lien of any mortgage or deed of trust made in good faith and for value.

7.      Covenants, conditions, restrictions and easements in the document recorded August 05, 1976 as Instrument No. 76-251226 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction Indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

8.      An easement for electricity and telephone and incidental purposes, recorded December 06, 1976 as Instrument No. 76-405981 of Official Records.
In Favor of:                                San Diego Gas and Electric Company
Affects:                                As described therein

9.      A document entitled "Grants of Easements for Sewer and Construction of Streets" recorded February 13, 1980 as Instrument No, 80-51503 of Official Records.

10.    An easement for access and utilities and incidental purposes, recorded August 28, 1984 as Instrument No. 84-327707 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

11.    Planning Commission Resolution No. 5614, Granting Conditional Use Permit No. 82-0003 (Amendment to Conditional Use Permit Nos. 571-PC and 82-0003) recorded June 25, 1985 as File No. 85-225840 of Official Records and amended by document recorded March 13, 1987 as File No. 87-131476 of Official Records.

12.    A document entitled "Planning Commission Resolution No. 0752-PC, Granting Conditional Use Permit No. 89-0585 (Amendment to Conditional Use Permit No. 86-0803)" recorded December 14, 1990 as Instrument No. 90-666946 of Official Records.

13.    An easement for access and utilities and incidental purposes, recorded July 09, 1993 as Instrument No. 1993-0441880 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

14.    An easement for access and utilities and incidental purposes, recorded November 18, 1993 as Instrument No. 1993-776476 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

15.    An easement for access and utilities and incidental purposes, recorded April 15, 1994 as Instrument No. 1994-250435 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

16.    An easement for access and utilities and incidental purposes, recorded June 29, 1994 as Instrument No. 1994-411280 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

17.    An easement for access and utilities and incidental purposes, recorded June 03, 1997 as Instrument No. 1997-259752 of Official Records.
       In Favor of:                               San Diego Gas and Electric Company
       Affects:                                   As described therein

       The location of the easement cannot be determined from record information.

18.    The terms, provisions and easement(s) contained in the document entitled "Reciprocal Easement Agreement and Agreement between Adjacent Landowners" recorded March 02, 1998 as Instrument No. 1998-109119 of Official Records.

19.    The terms, provisions and easement(s) contained in the document entitled "Easement Agreement" recorded June 22, 1998 as Instrument No. 1998-380889 of Official Records.

20.    An easement for access and utilities and incidental purposes, recorded January 25, 2002 as Instrument No. 2002-0066868 of Official Records.
       In Favor of:                                        San Diego Gas and Electric Company
       Affects:                                            As described therein

21.    An easement for access and utilities and incidental purposes, recorded May 23, 2002 as Instrument No. 2002-0437993 of Official Records.
       In Favor of:                                        San Diego Gas and Electric Company
       Affects:                                            As described therein

       The location of the easement cannot be determined from record information.

22.    An easement for access and utilities and incidental purposes, recorded July 25, 2002 as Instrument No. 2002-0624423 of Official Records.
       In Favor of:                                        San Diego Gas and Electric Company
       Affects:                                            As described therein

       The location of the easement cannot be determined from record information.

23.    A document entitled "Site Development Permit/Planned Development Permit No. 98-1199 Carroll Canyon Technology Center Conditional Use Permit No. 89-0585" recorded July 26, 2002 as Instrument No. 2002-0627141 of Official Records.

24.    The terms and provisions contained in the document entitled "Encroachment Maintenance and Removal Agreement" recorded March 25, 2003 as Instrument No. 2003-03277 78 of Official Records'.

25.    The terms and provisions contained in the document entitled "Encroachment Maintenance and Removal Agreement" recorded March 25, 2003 as Instrument No. 2003-0327783 of Official Records.

26.    The terms and provisions contained in the document entitled "Agreement between Adjacent Landowners Re Payment of Costs of Camino Santa Fe Improvements" recorded April 07, 2003 as Instrument No. 2003-0384334 of Official Records.

       An "Agreement for Partial Termination of Agreement Between Adjacent Landowners Regarding Payment of Costs of Camino Santa Fe Improvements", recorded January 28, 2010 as File No. 2010-0045848 of Official Records.

27.    The terms and provisions contained in the document entitled "Drainage Facilities Deed Restriction and Agreement between Adjacent Landowners" recorded April 07, 2003 as Instrument No. 2003-0384335 of Official Records.

28.    Covenants, conditions, restrictions and easements in the document recorded June 12, 2003 as Instrument No. 2003-0695438 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code.  Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Document(s) declaring modifications thereof recorded January 24, 2006 as Instrument No. 2006-0052355 of Official Records.

Document(s) declaring modifications thereof recorded June 16, 2010 as Instrument No. 2010-0301539 of Official Records.

29.    A right of first refusal in favor of California Proton Treatment Center, LLC, a Delaware limited liability company as contained in or disclosed by a document recorded June 16, 2010 as Instrument No. 2010-0301540 of Official Records.

30.    An option in favor of California Proton Treatment Center, LLC, a Delaware limited liability company as contained in or disclosed by a document recorded June 16, 2010 as Instrument No. 2010-0301540 of Official Records.

31.    The terms, provisions and easement(s) contained in the document entitled "Agreement and Grant of Easements" recorded June 16, 2010 as Instrument No. 2010-0301541 of Official Records.

32.    The terms and provisions contained in the document entitled "Declaration of Restrictions" recorded August 18, 2010 as Instrument No. 2010-0427619 of Official Records.

33.    The terms and provisions contained in the document entitled "FBA Fee Deferral Agreement" recorded October 07, 2010 as Instrument No. 2010-0540415 of Official Records; as amended by First Amendment to Agreement and Grant of Easements dated July 11, 2011, between H.G. Fenton Property Company, a California corporation, and California Proton Treatment Center, LLC, recorded July 28, 2011 as Document No. 2011-0383980.

34.    The terms and provisions contained in the document entitled "Storm Water Management and Discharge Control Maintenance Agreement" recorded December 23, 2010 as Instrument No. 2010-0713466 of Official Records.

35.    Easements, Covenants and Conditions contained in the deed from G. G. Fenton Property Company, a California corporation which acquired title as H. G. Fenton Material Company, as Grantor, to California Proton Treatment Center, LLC, a Delaware limited liability company, as Grantee, recorded June 16, 2010 as Instrument No. Instrument No. 2010-0301540 of Official Records.  Reference being made to the document for full particulars.

36.    The terms, provisions and easement(s) contained in the document entitled "Agreement and Grant of Easements" recorded June 16, 2010 as Instrument No. 2010-0301541 of Official Records; as amended by First Amendment to Agreement and Grant of Easements dated July 11, 2011,

between H.G. Fenton Property Company, a California corporation, and California Proton Treatment Center, LLC, recorded July 28, 2011 as Document No. 2011-0383980.

**Annex III**

**Interest and Fees**

| | |
|---|---|
| **Interest Rates**: | All amounts outstanding under the DIP Facility shall bear interest as follows: |

> at LIBOR (which in no event shall be less than 1%) <u>plus</u> 9.00% *per annum*.

As used herein, the "<u>LIBOR</u>" calculation shall be substantially consistent with the Prepetition Facility.

**Default Interest**: During the continuance of an Event of Default, the loans and all other outstanding obligations shall bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable and such interest shall be payable in cash.

**Upfront Fee**: $560,000, payable to each DIP Lender according to its pro rata share of the New Money Loans which fee shall be fully earned on the Closing Date and shall be ratably added to the then outstanding DIP Loans on such date and shall constitute principal thereof for all purposes hereof.

**Agency Fees**: $80,000 per annum, payable to the DIP Administrative Agent, which amount shall accrue monthly, calculated on the basis of a 360-day year of twelve 30-day months and such amount shall be junior to the Varian Services and senior to payments of principal and interest on the Loans to the Lenders.

**Nature of Fees**: Non-refundable under all circumstances.

**<u>Annex IV</u>**

**<u>Initial Budget</u>**

**EXHIBIT B**

**DIP Budget**

#4818-4498-0029

| Amounts in $'000 | 1 Forecast Mar-17 | 2 Forecast Apr-17 | 3 Forecast May-17 | 4 Forecast Jun-17 | 5 Forecast Jul-17 | 6 Forecast Aug-17 | 7 Forecast Sep-17 | 8 Forecast Oct-17 | Post Petition 2017 |
|---|---|---|---|---|---|---|---|---|---|
| Total Fractions | 1,140 | 1,164 | 964 | 951 | 951 | 996 | 919 | 996 | 8,084 |
| Treatment Days | 23 | 20 | 22 | 22 | 20 | 23 | 20 | 22 | 172 |
| Average Fractions per Day | 50 | 58 | 44 | 43 | 48 | 43 | 46 | 45 | 47 |
| **Cash Receipts** | | | | | | | | | |
| MMBC Receipts | $ 1,615 | $ 1,716 | $ 2,077 | $ 1,890 | $ 1,563 | $ 1,553 | $ 1,471 | $ 1,594 | 13,479 |
| Third Party Receipts | $ 30 | $ 30 | $ 30 | $ 30 | $ 30 | $ 30 | $ 30 | $ 30 | 240 |
| Property Tax Refund | - | - | - | - | - | - | - | - | - |
| Total Receipts | $ 1,645 | $ 1,746 | $ 2,107 | $ 1,920 | $ 1,593 | $ 1,583 | $ 1,501 | $ 1,624 | $ 13,719 |
| **Operating Disbursements (Scripps Clinical)** | | | | | | | | | |
| Scripps Total | $ (1,423) | (1,358) | (1,108) | (1,108) | (1,108) | (1,108) | (1,108) | (1,108) | (9,425) |
| **Operating Disbursements (CPTC Clinical)** | | | | | | | | | |
| CPTC Total | $ (549) | (1,901) | (1,159) | (558) | (1,226) | (1,225) | (575) | (891) | (8,084) |
| **Non-Recurring Disbursements** | (380) | | | | | | | | |
| Debtor's Counsel (Locke Lord) | (475) | (50) | (475) | (475) | (475) | (475) | (475) | (475) | (3,800) |
| Delaware Legal Counsel (Polsinelli) | (60) | (50) | (50) | (30) | (30) | (45) | (45) | (30) | (340) |
| CRO (CMAG) | (180) | (180) | (180) | (180) | (180) | (180) | (180) | (80) | (1,340) |
| Lender Legal Fees (Millbank) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (2,000) |
| Lender FA Fees (Loughlin) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (1,200) |
| Ombudsman (TBD) | (70) | (50) | (50) | (25) | (25) | (25) | (25) | - | (245) |
| Investment Bank Fees (TBD) | (125) | (50) | (50) | (50) | (50) | (50) | (50) | (550) | (975) |
| Public Relations/Investor Relations Firm | (10) | - | - | - | - | - | - | - | (10) |
| Trustee Fees | (13) | - | - | (13) | - | - | (13) | (4) | (43) |
| Critical Vendors | (695) | - | - | - | - | - | - | - | (695) |
| Consultants | (65) | (45) | (45) | (45) | (45) | (45) | (45) | (45) | (380) |
| Contingency | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (80) |
| DIP Interest/Commitment Fees | - | - | - | - | - | - | - | - | - |
| Transition Expenses | - | - | - | - | - | - | - | - | - |
| Total Non-Recurring Disbursements | (2,103) | (1,260) | (1,235) | (1,228) | (1,215) | (1,230) | (1,243) | (1,594) | (11,109) |
| **Investing Activities** | | | | | | | | | |
| Capital Expenditures | (11) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (54) |
| Total Investing Activities | (11) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (54) |
| Net Operating Cash Flow after Capex | (2,441) | (2,779) | (1,401) | (979) | (1,961) | (1,985) | (1,431) | (1,975) | (14,952) |
| **Financing Activities** | | | | | | | | | |
| Tranche C Loan Draw | - | - | - | - | - | - | - | - | - |
| DIP Facility | 2,380 | 2,552 | 1,914 | 965 | 1,309 | 2,098 | 1,534 | 2,229 | 14,981 |
| Total Financing Activities | 2,380 | 2,552 | 1,914 | 965 | 1,309 | 2,098 | 1,534 | 2,229 | 14,981 |
| Increase (decrease) in cash | (61) | (227) | 514 | (14) | (653) | 113 | 103 | 255 | 30 |
| Cash, Beginning of Period | 5,570 | 5,509 | 5,282 | 5,796 | 5,782 | 5,129 | 5,243 | 5,345 | 5,570 |
| Cash, End of Period | $ 5,509 | $ 5,282 | $ 5,796 | $ 5,782 | $ 5,129 | $ 5,243 | $ 5,345 | $ 5,602 | $ 5,602 |
| **Ending Cash Balance** | | | | | | | | | |
| CPTC Operating Account (Unrestricted) | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | 0 |
| Scripps Operating Account (Restricted) | 1,905 | 1,678 | 2,192 | 2,178 | 1,526 | 1,639 | 1,742 | 1,998 | 1,998 |
| Scripps Working Capital Escrow Account (Restricted) | 3,603 | 3,603 | 3,603 | 3,603 | 3,603 | 3,603 | 3,603 | 3,603 | 3,603 |
| Orix Blocked Account (Restricted) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Ending Cash | $ 5,509 | $ 5,282 | $ 5,796 | $ 5,782 | $ 5,130 | $ 5,243 | $ 5,346 | $ 5,602 | $ 5,602 |
| DIP Facility Size | $ 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| Less Cumulative DIP Borrowings | $ (2,380) | (4,932) | (6,846) | (7,811) | (9,120) | (11,218) | (12,752) | (14,981) | (14,981) |
| Net Availability Under DIP Facility | $ 13,620 | 11,068 | 9,154 | 8,189 | 6,880 | 4,782 | 3,248 | 1,019 | 1,019 |